Horace A. LAMB, Respondent,

v.

William E. JORDAN, Appellant.

No. C1–82–397.

Supreme Court of Minnesota.

May 6, 1983.

Johnson, Fredin, Killen, Thibodeau & Seiler and Donald C. Erickson, Duluth, for appellant.

Gruesen, Petersen & Sage and Thomas W. Gruesen, Duluth, for respondent.

SIMONETT, Justice.

In this appeal we conclude the evidence does not justify a jury's verdict finding that the defendant is indebted to plaintiff on a promissory note, and we reverse and remand for a new trial.

Plaintiff-respondent Horace A. Lamb sued defendant-appellant William E. Jordan. In his complaint, Lamb alleged that he had sold his business to defendant Jordan and that Jordan had breached the purchase agreement in several respects, including the failure to pay a $41,000 promissory note. Plaintiff Lamb claimed that the note was for cash advances he had made to the defendant. The defendant denied any cash advances and claimed that the note, with typed inserts on the printed form (we will call it the typed note), was simply a replacement for a similar $41,000 note with handwritten inserts on the printed form (the handwritten note), which had first been issued to cover the unpaid portion of the purchase price for the business inventory. In other words, Jordan contended that plaintiff Lamb was trying to collect the same $41,000 twice, first by claiming he was entitled to $41,000 on the handwritten note for inventory and second by claiming another $41,000 on the typed note for purported cash advances. Defendant Jordan maintained that both notes were for the inventory obligation and that Lamb, instead of discarding the handwritten note after it was replaced by the typed note, fabricated his story about cash advances in order to collect on both notes.

The jury, after 7 hours of deliberation, returned a verdict in plaintiff's favor. The trial court, while observing that had it been the trier of fact it would have found for the defendant, held that there was sufficient evidence to sustain the verdict and denied defendant's post-trial motions for judgment notwithstanding the verdict or a new trial. Defendant appeals. The only issue is whether the evidence supports a finding that the cash advances were, in fact, made.

In July 1976 plaintiff-respondent sold his business, Lamb's Marine Supply, located in Schroeder, Minnesota, on the north shore of Lake Superior, to his employee, defendant-appellant Jordan. The parties originally agreed to a purchase price of $100,000 for the land, building and fixtures, with a downpayment of $14,000 and the remainder at 10% interest over 20 years. The inventory was to be sold at cost, later determined after a physical count to be $62,000. Lamb's attorney advised Lamb that 10% interest was usurious, so the parties agreed to a new purchase price of $115,000, and allocated $92,000 to the land and building and $23,000 to fixtures, to be paid over 20 years at 8%, with a downpayment of $30,000. Lamb's attorney drafted the sale papers and gave them to Lamb. Lamb, however, put the papers aside and did not show them to Jordan. On June 23, 1976, with the sale papers unsigned and without paying the $30,000 downpayment, Jordan took possession of the marine supply store business.

The $30,000 downpayment was made shortly thereafter in two installments. In mid-August Jordan gave Lamb a check for $16,000, which was applied to the inventory purchase price, reducing that debt to $46,000. Later, Jordan paid $14,000 by check which was negotiated in late September 1976. This reduced the balance on the land and building to $84,000 and the fixtures balance to $17,000. This remaining $101,000 on the land, building and fixtures was to be amortized over 20 years at the agreed-upon 8%. Jordan was required to make, and did make, the monthly payments of $844.82. In addition, the parties agree that Jordan has made several payments of principal and interest on the inventory balance, which now stands at $25,000.

For whatever reason, the amicable business relationship between Lamb and Jordan soon thereafter disintegrated. This much is clear. Pursuant to their agreement, in early 1977 Lamb balanced the books for Jordan's first 6 months' operating the store and discovered that Jordan had made a profit of at least $35,000. In late March 1977, Lamb proposed to change the terms of the yet unsigned purchase agreement. He suggested a new purchase price of $250,000 rather than the original $115,000. At this point, Jordan for the first time retained his own counsel, Vance Grannis, a South St. Paul attorney who owns a summer cabin in the area. Grannis advised Jordan that his agreement, even though unsigned, was enforceable by reason of part performance.

At trial Lamb said his reluctance to sign the original sale papers was at first because Jordan lacked financing and because Jordan subsequently refused to sign a note for money advanced by Lamb to Jordan in the summer of 1976 in four installments aggregating $41,000. Lamb also admitted he still wanted 10% interest on the inventory obligation.

On April 29, 1977, 10 months after Jordan had taken over the store, Jordan, Lamb and attorney Grannis met and agreed the contract would be signed as written. Grannis asked what other indebtedness needed to be reduced to writing and was told that $17,000 was owed on the fixtures and $46,000 on the inventory. There was no mention of any cash advances by Lamb to Jordan during the previous summer.

The next day, April 30, the parties met again and the sale documents were executed, namely, the bill of sale for the fixtures, the contract for deed on the store building and land, and a $17,000 handwritten note for the remaining debt on the fixtures. Sometime around this date of April 30, the inventory debt of $46,000 was reduced by a payment of $5,000, leaving a balance of $41,000. To represent this obligation, attorney Grannis prepared a note with handwritten inserts, dated April 30, 1977, in the amount of $41,000, payable "on or before 8 yrs" to "Horace H. Lamb" with 8% interest. Jordan claims he signed the note on April 30, although Lamb claims the note was signed some days later.

Also around this time, the typed note came into existence. This second note, dated April 30, 1977, is in the amount of $41,000, payable "June 30, 1984" to "Horace G. Lamb and Linda M. Lamb" with 8% interest. Attorney Grannis testified at trial that he had suggested the handwritten inventory note, which he had prepared, be replaced by a typed note. Jordan testified the typed note was prepared as a more formal copy of the handwritten inventory note and so that Mrs. Lamb's name could be added as a payee. Jordan believed that he signed the typed note, which had been prepared by Lamb, sometime after April 30 and before September 30, 1977. On the other hand, Lamb claims that his attorney (who died prior to Lamb's commencement of his lawsuit) had typed the note on April 30 as evidence of the debt on the cash advances and that Jordan signed the note on either May 1, 1977, or on the same day as the contract for deed was signed. In any event, Jordan did receive a photocopy of the signed, typed note. Neither the handwritten note nor the typed note contained any notation as to what it was for.

On September 30, 1977, the parties met again, this time at the office of Lamb's attorney, with their attorneys. Attorney Grannis had discovered that the monthly payment of $844.82 on the original sale documents mistakenly amortized the entire $101,000 debt, i.e., not only the $84,000 debt on the contract for deed but also the $17,000 debt on the note for the fixtures. At the September 30 meeting, corrective amendments to the sale documents were signed with no difficulty, and other minor disputes were discussed. At this time Jordan paid $3,280 by check for interest on the inventory note of $41,000. Jordan also paid $6,000 at this time on the principal of the $41,000 inventory debt. Since, however, Lamb would neither give Jordan a receipt for the $6,000 nor accept a check for that amount, Jordan, at his attorney's advice, wrote a check to "Cash" in the amount of $6,000, noting thereon that it was "principal on $41,000 to H.A. Lamb," then went to the bank, cashed the check and gave the cash to Lamb. Jordan then signed a note, prepared by Lamb before the meeting, for the new inventory debt of $35,000.

All parties agree that at this September 30 meeting a $41,000 note was returned to Jordan. They disagree which $41,000 note it was. Jordan claims that the handwritten $41,000 note had been returned to him earlier when he executed the typed note, and that, on September 30, it was the typed $41,000 note that was returned to him. Jordan claims, however, that he inadvertently left the typed note on a table in the law office and that Lamb apparently kept it and so had possession of it at the time he

filed suit. On the other hand, Lamb contends that the typed note was safely in his bank deposit box during the September 30 meeting and that the note which was returned to Jordan at that time was the handwritten note, which Jordan then tore in half.

In any event, nothing was mentioned at the September 30 meeting about any separate $41,000 debt for cash advances, nor, in the intervening period prior to suit, when attorney Grannis had "quite a few discussions" with Lamb, Jordan and Lamb's attorneys, was the subject of the cash advances and their overdue interest ever mentioned. On October 8, 1979, Lamb commenced suit.

At this point we should look more closely at Lamb's story about the cash advances. Lamb testified that when his purchaser took possession of the business on June 23, 1976, he was concerned that Jordan had sufficient operating capital and that, therefore, he advanced money to Jordan to provide a cash flow and to provide Jordan some equity in the business so that Jordan could procure outside financing from a bank. Lamb testified he gave Jordan the following sums that first summer: $11,000 on June 20; $12,000 on August 19; $4,000 on August 22; and $14,000 on September 1. These payments total $41,000. Lamb testified that the payments were all in cash and no receipts or notes were obtained.

Jordan denies receiving any money from Lamb. It is undisputed that, when Jordan took over the store, he was able to raise nearly $30,000 on his own from sale of some stock, savings and a loan from his parents. The initial delay in the downpayment also provided some operating capital. Lamb admitted discussing the proposed delay and Jordan testified that Lamb would not accept the downpayment on June 23, explaining that Jordan could use it for operating funds. Lamb also admits he offered to carry Jordan's inventory debt. Further, a substantial portion of the store's business was in stocking supplies for ore freighters and Jordan was successful in shortening the 60-day period between stocking of a freighter and receipt of payment from the shipping company, and this also helped the cash flow. Charles Baxter, a certified public accountant, testified that based on Jordan's own investment of $29,000, the business generated sufficient cash from June 23, 1976, to September 30, 1976, to cover business expenses and the $35,000 paid by Jordan to Lamb.

A. Defendant-appellant Jordan first argues that his motion for judgment notwithstanding the verdict should have been granted. We disagree.

■ Judgment notwithstanding the verdict "may be granted only when the evidence is so overwhelming on one side that reasonable minds cannot differ as to the proper outcome." 4 D. McFarland & W. Keppel, Minnesota Civil Practice § 2402 (1979 and Supp.1982). *See also Bisher v. Homart,* 328 N.W.2d 731 (Minn.1983), *quoting Seidl v. Trollhaugen,* 305 Minn. 506, 232 N.W.2d 236 (1975); 2 Minn.R.Civ.P. 50.-02(1). In applying this standard, (1) all the evidence, including that favoring the verdict, must be taken into account, (2) the evidence is to be viewed in the light most favorable to the verdict, and (3) the court may not weigh the evidence or judge the credibility of the witnesses. McFarland & Keppel, *supra.* Lamb's testimony, if unweighed and considered to be credible, is sufficient to support the finding that the cash advances were made. At least, on this record, we hesitate to conclude that the evidence is so overwhelming as to preclude reasonable minds from differing.

■ B. Defendant-appellant Jordan next argues that he should at least have a new trial because the evidence does not justify the verdict. *See* Minn.R.Civ.P. 59.-01(7). Unlike a motion for judgment notwithstanding the verdict which raises a purely legal question, the new trial motion presents a factual question, where the reviewing judge may properly weigh the evidence. The test is as follows:

A new trial should not be granted unless the verdict is so contrary to the preponderance of the evidence as to imply

that the jury failed to consider all the evidence or acted under some mistake or from some improper motive, bias, feeling or caprice, instead of honestly and dispassionately exercising its judgment.

*LaValle v. Aqualand Pool Co., Inc.,* 257 N.W.2d 324, 328 (Minn.1977). Although this standard is demanding, it is not as rigorous as the judgment notwithstanding the verdict standard. *See* 4 McFarland & Keppel, *supra,* § 2418 (1979). Applying this test, we hold that a new trial is required.

The only evidence of the cash advances is Lamb's testimony, and the story he tells is contradicted by logic and other evidence at almost every point. There is no need here to outline the evidence in complete detail; several observations will suffice.

1. First, there are disturbing signs that the story has been fabricated. The story advanced by plaintiff at trial is fairly simple, and yet it is at odds with the allegations of his complaint. The complaint does not list the specific cash advances nor does it allege two separate $41,000 notes. It incorrectly alleges that the $14,000 downpayment was not made; it states that the $46,000 obligation included cash advances and that the $41,000 note was for additional inventory and cash advances. The complaint also identifies the inventory sales price as $16,000 rather than $62,000. These major discrepancies continued up to the time interrogatories were filed. At that time, contrary to Lamb's later trial testimony, the *typewritten* note was identified as the *inventory* note.

2. Also troubling is the lack of any evidence corroborating the cash advances. Putting to one side the coincidence that the alleged cash advances totaled exactly the same as the inventory balance, the fact is that these advances were made in cash, with no witnesses. No receipts or individual notes were executed as the payments were made. Interest in the amount of $2,800 was allegedly paid in cash in May 1977 on the advances, yet all subsequent interest payments on the undisputed inventory debt were made by check. Two and one-half years elapsed between the March 1977 breakup (and Jordan's retention of an attorney) and the filing of the complaint; yet during this time no written demands were made for the interest, much less principal. No mention of the debt was ever made to Jordan's attorney, as Lamb admits. If the advances were made, the failure to mention them at either the April 30 or the September 30 meeting, when the parties with their attorneys were trying to resolve all differences, is inexplicable. Neither is there any kind of documentary evidence of the advances. Lamb's proposal in March 1977 to increase the purchase price to $250,000 was in writing and purportedly represented an amortization of the debts outstanding, including the alleged $41,000 cash advances. Yet the written proposal shows no debt for cash advances while it does show Jordan's $30,000 investment. This is consistent with Lamb's reconciliation of the books, which showed an investment of $30,000 and no debt.

3. Lamb's story that Jordan needed cash does not seem credible. Lamb's delay in accepting downpayment and willingness to carry the inventory provided adequate cash flow. If these payments were to be made with Lamb's own money, there was no reason to delay them after the official sale date of July 1. As to the need to build equity to acquire financing, there is no evidence that Jordan ever visited with any banker to get financing, and if he had, the cash advances would have had to be disclosed as other outstanding debt. Further, Lamb does not rebut the accountant's testimony that, in fact, no cash advances were required or evidenced up to September 30, 1976. Lamb's only explanation is that the advances were not deposited.

■ 4. Although the authority granted in Rule 59.01(7) should be exercised with caution, *Koenig v. Ludowese,* 308 Minn. 380, 384, 243 N.W.2d 29, 31 (1976), and this court will usually defer to the exercise of that authority by the trial court, which has the feel of the trial, *Conover v. Northern States Power Co.,* 313 N.W.2d 397, 408 (Minn.1981), we conclude that this case presents one of those exceptional instances requiring a re-

trial. When weighed, the evidence, with its collection of inconsistencies, improbabilities and contradictions, preponderates against the plaintiff to the extent that a new trial is justified. Lamb's only explanation for the total lack of corroboration is that he and Jordan had agreed to keep the fact of the advances secret between themselves. Given the acrimony of their other dealings, this is doubtful. Moreover, it is not simply that the story of the cash advances is unlikely and uncorroborated. The story lacks corroboration in several places and circumstances where we would expect corroboration to be present.

Reversed and remanded for a new trial.