Gary Michael GILLESPIE, et al.,
Respondents,

v.

Laurence J. KLUN, Appellant.

No. C2–86–1924.

Court of Appeals of Minnesota.

May 26, 1987.

Review Denied July 9, 1987.

Rehearing Denied Aug. 19, 1987.

Thomas J. Bieter, Duluth, for respondents.

John J. Killen, Johnson, Killen, Thibodeau, & Seiler, P.A., Duluth, for appellant.

Heard, considered, and decided by POPOVICH, C.J., and LANSING and RANDALL, JJ.

## OPINION

RANDALL, Judge.

Respondents sued appellant for legal malpractice in connection with a real estate transaction. Appellant counterclaimed for damages due to defamation. After hearing the evidence, a jury awarded respondents $75,000 for damage to their credit or reputation; $25,000 punitive damages; and $25,000 damages for emotional distress. On the emotional distress damages, the jury was asked to compare negligence, and they attributed 75% to appellant and 25% to respondents. Klun appeals the trial court's denial of his motion for judgement notwithstanding the verdict (JNOV) or a new trial. Respondents filed a notice of review of the issues of attorney fees and treble damages. We affirm.

## FACTS

*Purchase agreement*

Early in 1981, respondents (referred to as "respondents," individually Gary and Kim Gillespie, or as the Gillespies) and the Riikolas entered into negotiations whereby the Riikolas sold respondents, on a contract for deed, an apartment building located in Ely, Minnesota. Mr. and Mrs. Riikola contacted appellant, who drew up the purchase agreement and the contract for deed. At this point appellant represented all four parties in different capacities. When the parties met at appellant's office to sign the purchase agreement, respondents asked appellant to do a title opinion for them. Appellant said he agreed to do so with the understanding that if a dispute arose, he would have to withdraw from representation. Appellant testified:

> [A]t that point I told them—this is talking to all four of them—that an attorney normally shouldn't be representing both parties in a case, or in a situation, but if both parties agree and I asked them if they agreed, and they said they did, and I asked them if both parties understand that if there's anything that goes wrong in the transaction as it goes from the first agreement to the actual closing, that time period when the abstract is brought up and the title opinion is done, if any problem arises there, then I would have to withdraw my representation, but if it was just a matter of doing the paperwork, essentially, making sure the terms went into the final document, and that title was marketable, I could do that title opinion.

All parties to the sale agreed that appellant would represent sellers and buyers, and appellant did a title opinion for respondents. Appellant billed respondents for the title opinion, for the contract for deed registration, and for drafting some letters. He billed the Riikolas for preparing the earnest money agreement and the contract

for deed. Respondents correctly believed appellant was representing both them and the Riikolas during this transaction.

When respondents took possession, the apartment building was 70% occupied and not quite breaking even. Respondents insulated the building, repaired broken windows, painted, and replaced appliances. When the mines in the area began to close, occupancy of the building dropped and respondents were able to keep only two or three of the seventeen units rented. By the end of 1982, they began falling behind on the fuel and tax bills and other bills connected with the building. Respondents began to have marital problems and blamed the problems on stress caused by the severe financial repercussions of their having purchased the building.

*Termination of Contract*

By August 1983, respondents were behind on their contract for deed payments and had lost hope that the apartment building would become economically profitable. They contacted the Riikolas and asked them to take the building back. The Riikolas did not want the building back, but were amenable to negotiating with respondents. Respondents met with the Riikolas in late August 1983. The four discussed possible remedies and agreed to cancel the contract for deed. Respondents agreed to pay whatever back bills they owed, including those for fuel, water, garbage, sewer, and back taxes. Respondents were concerned about harm to their credit rating.

Appellant was not involved in the negotiations. Once respondents and the Riikolas came to an agreement, the Riikolas contacted appellant. Mrs. Riikola met with appellant on September 12, 1983, and sought his advice on the matter. Appellant sent the Riikolas a letter agreeing to handle the contract for deed cancellation.

Gary Gillespie testified that, on October 24, 1983, when he brought appellant the unpaid bills, appellant asked him what he had done with "all the money." Gillespie testified that appellant asked him, "Well, did you salt any of the money away, or did you frivolously spend any of the money?" Gary Gillespie became upset. Appellant

denied making this statement and testified he asked Gary Gillespie if he had a lawyer. Gary Gillespie denied appellant asked him if he had a lawyer. Appellant testified that he asked the question to ascertain if he should be talking directly to their attorney instead of to the Gillespies.

Appellant testified that he spoke with Kim Gillespie in his office on November 8, 1983, when she brought in additional bills relating to the building. He claims he asked her if the couple had an attorney, and told her he represented only the Riikolas. Kim Gillespie denied appellant made this statement.

Early in November 1983, Ron Riikola telephoned respondents and arranged to meet them in appellant's office on November 23, 1983, to sign the papers. Gary Gillespie asked Ron Riikola if he needed an attorney. Gillespie testified that Riikola told him appellant would handle the matter for both couples. Riikola denied making the statement.

*November 23, 1983, Meeting*

On November 23, 1983, the Riikolas and Gary Gillespie met at appellant's office to sign the papers. Kim Gillespie was unable to attend the meeting. The Riikolas arrived before respondent Gary Gillespie. Appellant explained the documents to the Riikolas without Gary Gillespie present.

The documents were a quit claim deed; a confession of judgment, wherein respondents admitted liability in favor of the Riikolas for all outstanding debts on the property; and an agreement, wherein respondents admitted defaulting on the contract for deed, and agreed to rescission of the contract for deed. After the Riikolas and appellant finished going over the documents, appellant called Gary Gillespie into the room.

Appellant testified that, at this point, he told Gary Gillespie,

I'm representing Mr. and Mrs. Riikola here, and we're here because you haven't been able to perform under the contract for deed.

Gary Gillespie denied appellant made such a statement.

Appellant also testified he did not advise respondents to agree to pay the delinquent taxes and other bills. Appellant then left the room. When he returned, he discovered the Riikolas and Gary Gillespie in a dispute over a term in the confession of judgment requiring the Gillespies to make the delinquent installment payments on the contract for deed. Gillespie believed he should not have to make the payments because respondents were giving the property back.

Ron Riikola threatened to sue if Gillespie did not sign the agreement. Gillespie asked appellant if the Riikolas could sue him. Gary Gillespie testified:

I said, "Gee, you know, I didn't realize we had to pay these payments we were behind on." I said, "I don't think I want to pay those." And I asked Larry [appellant], you know, "Do I have to pay these?" "Is that the law?" "Am I liable for that?" And Larry said something to the effect, "Yeah, that's the law." "You have to pay those."

Appellant testified:

What I recall Gary saying is that, "Gee, I don't really feel I have to pay those installment payments." And Ron Riikola said to him, "Well, I'll get those payments out of you some way." And at that point Gary turned to me and said, "Well, can he sue me?" And I said, "Well, sure, he can sue you, but you have a right to get an attorney of your own to decide the point." And at that point, I stated to him that, what these installments were; they were for the time period while he was still in possession.

Gary Gillespie denied appellant told him on November 23, 1983, to get an attorney of his own. He testified that prior to November 23, 1983, appellant never told him to get his own lawyer. Gillespie signed the papers, and later that day Kim Gillespie came into appellant's office and signed the papers. She complained to appellant's secretary about the terms of the agreement. Appellant was not present, but testified that his secretary told Kim Gillespie appellant was representing only the Riikolas.

Kim Gillespie denies the secretary made the statement.

*The Documents*

Respondents believed they were cancelling the contract for deed. The papers they signed in appellant's office were an agreement, a confession of judgment, and a quit claim deed.

The agreement admits respondents were in default on the contract for deed terms and purports to rescind the contract for deed. It contains a release by the Riikolas of all claims against respondents except those arising out of negligence, and except those claims respondents contracted to pay as provided in the agreement. Respondents agreed to execute a quit claim deed and discharge all claims against the sellers. The agreement contains a term whereby respondents admit liability for unpaid debts on the property including real estate taxes, fuel oil, municipal utilities service, renters' deposits, and "other similar accounts and obligations" in favor of the Riikolas. This term also contains the following language:

Purchasers hereby state that it is their intent to satisfy all such debt incurred by Purchasers or arising during their possession of the premises and Purchasers hereby agree to indemnify and defend the Sellers * * * from all judgments, damages, actions and causes of action * * *.

The agreement required respondents to execute a confession of judgment in favor of the Riikolas for all debts incurred during respondents' possession, and to waive their statutory right to redemption.

The confession of judgment states that respondents confess judgment owing to the Riikolas on default for 1982 and 1983 real estate taxes ($5,584.40); fuel oil bills ($5,996.93); municipal utilities ($624.17); delinquent contract for deed payments ($2,950); and all other indebtedness "known or unknown, which has or may become a lien or encumbrance against said described premises." It obligates respondents for "reasonable attorney fees attributable to said debts." The quit claim deed purports to reconvey the property and quit claim respondents' interest to the Riikolas.

After the November 23 meeting, appellant sent both parties separate bills for the meeting. Appellant claimed he billed respondents for legal work done in connection with the November meeting, not because he viewed them as his clients, but because he believed the language in the confession of judgment obligated respondents to pay the attorney fees. Appellant believed respondents were obligated to pay his bill, and respondents were under the impression they owed appellant for representing them. The Gillespies paid appellant a $300 retainer prior to the November 23 meeting. The bill appellant mailed the Gillespies after the meeting was for $617.35. He sent the Riikolas a similar bill which showed a credit for respondents' payment of his retainer.

Respondents made payments under the judgment, but fell into financial difficulties and stopped making payments. In January, 1984, appellant filed the confession of judgment for $15,155. Respondents, separated and going through a divorce at this time, retained an attorney who, after investigating the matter, successfully moved to have the confession of judgment vacated, and commenced this malpractice suit against appellant. The fuel oil company and other creditors of debts owing on the apartment building are still attempting to collect on the unpaid bills from respondents.

As part of their evidence that appellant's actions caused them monetary damages, respondents produced evidence of the following: When respondents purchased the apartment building, Gary Gillespie owned a small construction business. He began in 1976 by insulating homes and eventually progressed to doing remodeling jobs, building homes, and doing small commercial carpentry jobs. He had never been sued, and had no outstanding judgments against him. Respondents dispute appellant's claim that respondents' carpentry business was in financial trouble in November 1983. He left his carpentry business when he moved to the Twin Cities to be near his children, and remained unemployed for a time.

Prior to November 23, 1983, respondents owned a duplex, which was rented out and profitable. In August 1983 when respondents began having difficulty paying the apartment house bills, they were current in all other payments not related to the apartment building, including their home and duplex payments. They had outstanding installment debts of $46,000, which were current in August 1983.

Respondents received marital counseling in 1980, and testified counseling resolved their marital problems at that time. They testified that the apartment building and appellant's actions caused new marital stress. In November 1983 they resumed counseling together, and Kim Gillespie began individual counseling, at the Range Mental Health Center for stress caused by the couple's financial difficulties. They blamed each other for losing the apartment building. This counseling continued until June 1984. Gary Gillespie also counseled twice at the Range Mental Health Center in May 1984 for emotional distress arising from the couple's financial difficulties.

The Gillespies separated in May 1984. Kim Gillespie continued to blame Gary Gillespie for signing the documents. She and the children moved to the Twin Cities in August 1984, and Gary soon followed. Both were unemployed. They were unable to pay approximately $46,000 in unsecured debts. They lost both the duplex and their homestead after foreclosure, and were unable to pay any of the bills covered by the confession of judgment.

*Expert Testimony*

At trial, appellant called an expert, Vernon Saxhaug, of Virginia, Minnesota, to testify on the standard of practice in the community. Saxhaug testified that appellant could properly represent both parties to a real estate transaction if there was no dispute. He testified that if a dispute developed, he would not represent all of the parties, but could represent either of the parties. When asked what he would do in the event of a dafault, Saxhaug testified he could continue to represent the seller, but could not represent both the buyer and the seller. He testified he would normally noti-

fy the parties of this by letter, but in some cases he would advise them orally. When asked whether an attorney-client relationship existed under facts similar to this case, Saxhaug testified that was a jury question.

Both of respondents' experts testified that appellant's conduct on November 23, 1983, violated community standards. David Stall, a Virginia attorney, testified for respondents that in the Ely community, it is not common practice for an attorney to represent both parties to a real estate purchase agreement. He testified that an attorney must do so with caution because the parties have inherently conflicting interests. Stall was of the opinion that once a default develops, an adversarial situation exists, and standard practice in the Ely area is that the attorney would withdraw from the case after giving both parties notice. He testified that the documents drawn up by appellant did not conform to community practices for rescission or cancellation of a contract for deed. He testified that the confession of judgment improperly obligated respondents to the Riikolas for unpaid fuel bills and other unpaid bills arising from the transaction.

Attorney Richard Bye, testifying as an expert for respondents, stated that when an attorney initially represents both parties to a real estate transaction, and one of the parties later defaults, community standards require that the attorney withdraw from representing either party.

### Procedural History

On October 22, 1984, respondents commenced this malpractice action against appellant, seeking damages and attorney fees. Appellant answered with a general denial. Respondents filed an amended complaint. In his answer to the amended complaint, appellant alleged damages for defamation. In their reply, respondents raised the defense of truthfulness. On January 28, 1985, respondents served on appellant interrogatories and a notice of claim for bad faith attorney fees under Minn.Stat. § 549.21 (1984), based on appellant's defamation allegation.

Respondents' complaint alleged appellant's acts constituted negligence and breach of contract because he continued to represent both parties to a real estate transaction after an adverse situation developed. Respondents sought $50,000 or more actual damages, $25,000 punitive damages, and attorney fees and costs. Respondents also sought treble damages for willful disregard of their rights under Minn.Stat. § 481.071 (1984), alleging collusion between appellant and the Riikolas. Respondents did not allege a separate count of damages for emotional distress.

The trial court granted appellant partial summary judgment on respondents' emotional distress claim. However, respondents moved for reconsideration and the court reversed its grant of summary judgment for emotional distress.

The matter was tried to a jury from September 17 to September 19, 1986. At the close of testimony, appellant moved for a directed verdict on all issues. The court granted appellant's motion for summary judgment on treble damages and attorney fees, finding no evidence of collusion, but denied all other motions.

The jury found an attorney-client relationship existed between appellant and respondents when the claimed malpractice occurred, November 23, 1983; that appellant breached a duty of reasonable care; that his acts were the direct cause of respondents' damages; that respondents suffered damage to their credit rating and reputation, attributable solely to appellant's negligence, of $75,000; that respondents suffered emotional distress, 25% attributable to respondents and 75% to appellant, of $25,000; and that appellant was liable for $25,000 punitive damages. The jury found respondent Gary Gillespie defamed appellant, but that appellant sustained no monetary damage or damage to his professional reputation as a result.[1]

---

**1.** The special interrogatories asked, in part:

Appellant moved for JNOV or a new trial. Respondents moved for attorney fees, costs and prejudgment interest. The trial court awarded respondents prejudgment interest and denied all other motions. Klun appeals from the trial judgment and the judgment denying his motion for JNOV or a new trial. Respondents filed a notice of review of the trial court's denial of treble damages and attorney fees.

## ISSUES

1. Did an attorney-client relationship exist between appellant and respondents on November 23, 1984?

2. Did appellant breach a duty owed to respondents?

3. Did respondents suffer damage to their credit rating or reputation proximately caused by appellant?

4. Did respondents suffer emotional distress proximately cause by appellant?

5. Was the $25,000 punitive damage verdict supported by the evidence?

6. Are respondents entitled to bad faith attorney fees for trial and appeal, and treble damages under Minn.Stat. § 481.071 (1984)?

## ANALYSIS

### I.

*Standard of Review*

JNOV may be granted only when the evidence is so overwhelming on one side that reasonable minds cannot differ as to the outcome. *Lamb v. Jordan*, 333 N.W.2d 852, 855 (Minn.1983). The applicable standard for JNOV or a new trial is whether any competent evidence reason-

1. Did an attorney-client relationship exist between Mr. and Mrs. Gillespie and Mr. Klun on November 23, 1983?

ANSWER: Yes  X  No _____

2. If such attorney-client relationship existed between Mr. and Mrs. Gillespie and Mr. Klun on November 23, 1983, were Mr. Klun's advice or actions negligent or did they breach the attorney-client obligation?

ANSWER: Yes  X  No _____

3. If such advice or acts were negligent or breached the attorney-client obligation, were such acts or advice the direct cause of the plaintiffs' damages?

ANSWER: Yes  X  No _____

4. Were Mr. and Mrs. Gillespie damaged in their reputation or credit ratings by the advice or actions of Mr. Klun?

ANSWER: Yes  X  No _____

5. Were plaintiffs damaged in their reputation or credit rating by reason of their own acts or conduct?

ANSWER: Yes _____ No  X

6. If you answer both of the two preceding questions "yes", then what percentage of such damages were the result of:

The conduct of:

| | |
|---|---|
| Mr. Klun | 100 % |
| Mr. and Mrs. Gillespie | % |
| (The percentages must total 100%) | 100 % |

7. What damages did Mr. and Mrs. Gillespie suffer to their credit or reputation, whether by reason of the conduct of Mr. Klun or their own conduct?

$ 75,000

8. Did Mr. and Mrs. Gillespie suffer emotional distress as the result of the conduct of Mr. Klun?

ANSWER: Yes  X  No _____

9. Did Mr. and Mrs. Gillespie suffer emotional distress because of their own conduct or problems?

ANSWER: Yes  X  No _____

10. If you answer both of the preceding questions "yes", what percentage of the emotional distress resulted from:

The conduct of:

| | |
|---|---|
| Mr. Klun | 75 % |
| Mr. and Mrs. Gillespie | 25 % |
| (The total must equal 100%) | 100 % |

11. What damages did Mr. and Mrs. Gillespie suffer by way of emotional distress whether by reason of the conduct of Mr. Klun or their own conduct or circumstances?

$ 25,000

12. Was there clear and convincing evidence that the acts of Defendant Laurence J. Klun showed a willful indifference to the rights of the Plaintiffs?

ANSWER: Yes  X  No _____

Only if your answer to Question 12 was "yes", will you then answer the following question:

13. Is the Defendant Laurence J. Klun liable for punitive damages?

ANSWER: Yes  X  No _____

Only if your answer to Question 13 was "yes", will you then answer the following question:

14. How much in punitive punitive damages is Defendant Laurence J. Klun liable for?

$ 25,000

15. Did Plaintiff Gary Gillespie make certain statements respecting Defendant Laurence J. Klun to others in Ely and/or Minneapolis?

ANSWER: Yes  X  No _____

16. Were such statements defamatory of Mr. Klun in his profession?

ANSWER: Yes  X  No _____

17. Was Mr. Klun damaged in his professional reputation by such statements?

ANSWER: Yes _____ No  X

ably tends to support the verdict. *Blue Water Corp. Inc. v. O'Toole*, 336 N.W.2d 279, 281 (Minn.1983); *Conover v. Northern States Power Co.*, 313 N.W.2d 397, 401 (Minn.1981). We will affirm the verdict if it can be reconciled with the evidence and its fair inferences. *Savage v. K-Mart Corp.*, 393 N.W.2d 25, 27 (Minn.Ct.App. 1986).

JNOV is only appropriate where, as a matter of law, a party is entitled to a verdict. A judge must determine that the overwhelming weight of the entire evidence fails to support a verdict. 2A Herr and Haydock, *Minnesota Practice* (1985) 158.

A new trial will be granted if the weight of the evidence does not support the verdict. *Id.* All evidence must be taken into account and viewed in the light most favorable to the verdict. *Lamb*, 333 N.W.2d at 855. This court cannot weigh the evidence or judge the credibility of the witnesses. *Id.*

*Elements of a Legal Malpractice Action*

■ To prevail in a legal malpractice suit, a plaintiff must prove (1) the existence of an attorney-client relationship; (2) acts of negligence or breach of contract; (3) that these acts were the proximate cause of plaintiff's damage; (4) that but for defendant's conduct, plaintiffs would have been successful in defense of the underlying action. *Blue Water Corp., Inc.*, 336 N.W.2d at 281, citing *Togstad v. Vesely, Otto, Miller & Keefe*, 291 N.W.2d 686, 692 (Minn. 1980); *Christy v. Saliterman*, 288 Minn. 144, 150, 179 N.W.2d 288, 298–94 (1970).

*Attorney-Client Relationship*

Appellant argues no attorney-client relationship can be found based merely on respondents' assumption appellant was representing them, and contends nothing in the testimony or evidence presented at trial reasonably led respondents to believe appellant was representing them on November 23, 1983, the date of the alleged acts of malpractice. He relies on *Spannaus v. Larkin, Hoffman, Daly, & Lindgren, Ltd.*, 368 N.W.2d 395 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Aug. 20, 1985). He also points to his testimony that he asked respondents if they had their own attorney, and to his and the Riikolas' testimony that he told respondents he was representing only the Riikolas.

In *Spannaus*, the court found neither an express nor implied attorney-client relationship. In that case, appellant retained respondent law firm to represent him in a suit challenging his removal as a general partner in the limited partnership of Camelot Chateau Apartments. Appellant was the defendant in another suit brought by Commercial State Bank against appellant as guarantor on letters of credit which partially financed Camelot Chateau Apartments.

Spannaus informed respondent law firm that another attorney was representing him in the Commercial State Bank suit. However, when appellant delivered a number of papers on the partnership matter to respondent, he included the Commercial State Bank summons and complaint. Respondent informed appellant, by letter, on several occasions that it represented him only on the partnership matter. When respondent later learned appellant was unrepresented in the Commercial State Bank litigation, it advised appellant to seek counsel. Uncontroverted evidence showed appellant did not do so.

This court affirmed the trial court's grant of summary judgment based on its conclusion that no genuine issue of material fact existed as to lack of the existence of an attorney-client relationship in the Commercial State Bank litigation. Appellant's claim of representation was based merely on his "hope" respondents would represent him on the bank matter. *Id.* at 398–99.

■ Such is not the case here. Appellant admittedly represented both respondents and the Riikolas in the initial drafting and signing of the purchase agreement and the title search. He never expressly notified respondents that this relationship terminated. Appellant testified that, prior to the transaction to terminate the contract for deed, he told respondents he was no longer representing them. Respondents

testified that they did not recall being told that. This was a fact question for the jury to determine, and the jury found for respondents.

Respondents could reasonably have believed appellant continued to act as their counsel in handling the default on the contract for deed. Appellant billed respondents after the transaction and expected them to pay the bill. When he sent his bill, he did not explain why respondents were obligated to pay if they were not his client. If appellant believed respondents owed the bill based on language in the confession of judgment and accompanying agreement, and not because respondents were his clients, he should have expressed that directly to respondents. To the ordinary person, even one knowledgeable in business, receipt of an attorney's bill is usually a reasonable sign that the attorney feels he performed legal services based on an attorney-client relationship.

Respondents argue that this case is similar to *Togstad v. Vesely, Otto, Miller, & Keefe*, 291 N.W.2d 686 (Minn.1980). There respondent sought and was given legal advice from appellant law firm, and the supreme court held an attorney-client relationship based on the attorney's conduct. In *Togstad*, respondent's husband was left paralyzed after a medical procedure. Mrs. Togstad sought legal advice from respondent on whether to bring a medical malpractice suit. After an initial interview, appellant advised Mrs. Togstad she probably did not have a case, but that he would consult his partner and get back to her. Appellant did not contact Mrs. Togstad, and Mrs. Togstad did not consult another attorney for one year because she relied on appellant's advice that she did not have a case. *Id.* at 690.

The supreme court, in *Togstad*, relied on *Ryan v. Long*, 35 Minn. 394, 29 N.W. 51 (1886), and found an attorney-client relationship exists where

it sufficiently appears that plaintiff, for himself, called upon defendant, as an attorney at law, for "legal advice," and that defendant assumed to give him a professional opinion in reference to the

matter as to which plaintiff consulted him.

*Togstad*, 291 N.W.2d at 692–93 (quoting *Ryan*, 35 Minn. 394, 29 N.W. 51). The court in *Togstad* found it unnecessary to decide whether tort or contract theory would be preferable for determining the existence of an attorney-client relationship. *Togstad*, 291 N.W.2d at 693.

Here, testimony showed respondent Gary Gillespie, on November 23, 1983, called on appellant for legal advice when he asked appellant if he and his wife were obligated to pay the past due installments under the contract for deed, and whether the Riikolas could sue the Gillespies. Although appellant denies advising Gary Gillespie, we must view the evidence in the light most favorable to the verdict and uphold the jury's finding of an attorney-client relationship if it is supported by the evidence and its fair inferences.

Evidence, including appellant's prior representation of respondents in this matter, appellant's billing procedure, and the testimony of respondents, supports the jury's finding of an attorney-client relationship. Appellant had no written retainer agreement with respondents, but neither did he have one with the Riikolas. We do not find the jury verdict on this issue manifestly contrary to the evidence.

Appellant knew respondents were not represented by other counsel, and knew that they relied on him for legal advice at the outset of this real estate matter. When appellant charged respondents a retainer for handling the November 23 transaction and expected them to pay the balance of the bill after the transaction, it is difficult to say that respondents could not have formed a reasonable belief that appellant was acting as their attorney. Respondents so testified and the jury was entitled to accept their testimony as credible.

## II.

### Breach of Duty

■ The general rule in legal malpractice is that an attorney is liable for professional negligence only to those with whom

he has an attorney-client relationship. *Marker v. Greenberg*, 313 N.W.2d 4, 5 (Minn.1981).

Appellant argues that he did not owe respondents a duty because they were not his clients, and that an attorney owes no independent duty to an unrepresented party. Because we uphold the jury's finding that an attorney-client relationship existed, we will not address the issue of whether an attorney owes a duty to an unrepresented party.

■ Appellant also argues that evidence supports the conclusion that his conduct did not violate community standards. Testimony of both Stall and Bye supports the jury's finding that appellant committed acts of negligence and breach of duty.

Once respondents defaulted on the contract for deed, particularly when appellant found out the Riikolas were negotiating for more than the simple statutory cancellation of contract for deed,[2] appellant had a duty to unequivocally notify respondents, preferably in writing, that he could no longer represent them in this matter and advise them to obtain other counsel. Here, respondents' expert witnesses testified that appellant violated community standards and breached a duty to respondents by advising them to sign the confession of judgment, the agreement, and the quit claim deed. The evidence supports the jury's conclusion that appellant breached a duty owed respondents.

### III.

*Damage to Respondents' Credit Rating*

Appellant argues that no evidence supports the jury's verdict for damage to respondents' credit rating or reputation.

2. Generally when a buyer defaults on a contract for deed, a seller, although not technically bound to just one remedy, will elect to cancel the contract pursuant to statute. Minn.Stat. § 599.21 (1984). The seller then gets the property back, for better or for worse, and does not separately pursue unpaid installments. If there had been a straight statutory cancellation, respondents' money damages would not have been so exacerbated as they are here where appellant helped the Riikolas, in addition to getting back the real estate, get a binding agreement from respondents to pay back taxes, back

Appellant claims the damages awarded by the jury are speculative and conjectural. *Olson v. Aretz*, 346 N.W.2d 178 (Minn.Ct. App.1984). *Olson* is a case involving contract damages for lost profits and does not apply here. In this case, the special verdict interrogatories were framed in terms of either breach of contract or negligence.

■ An answer to a special verdict question will be set aside only when perverse and palpably contrary to the evidence. *Buttz v. Bergeson*, 392 N.W.2d 917, 920 (Minn.Ct.App.1986). The test is whether the answer can be reconciled in any reasonable manner consistent with the evidence and its fair inferences. *Id.* The trial court has the broadest discretion in determining whether a new trial should be granted on the basis of adequacy of the damages. *Sandt v. Hylen*, 301 Minn. 475, 477, 224 N.W.2d 342, 343 (1974). The special verdict interrogatories on damages for emotional distress and injury to respondents' credit or reputation asked the jury to apportion negligence between the parties. Neither party objected to the form of these interrogatories post-trial or on appeal. Fault for breach of contract is not compared. Minn. Stat. § 604.01, subd. 1a (1984); *Lesmeister v. Dilly*, 330 N.W.2d 95, 101 (Minn.1983).

Appellant claims the evidence is insufficient to support the jury's award of $75,000 for damages to respondents' credit or reputation. Both respondents testified they were meticulous about paying their bills on time, keeping their financial accounts in order, and living within their income while trying to increase their net worth. Uncontroverted evidence showed the apartment house was a financial disaster for them.

fuel bills, and back installment payments. Respondents agreed to legally accept thousands of dollars worth of debts on top of having to forfeit the building and all the money they had previously invested in it. Appellant found out from the Riikolas that they intended to negotiate with respondents for these thousands of dollars in addition to a return of the property. It was clear to appellant that the relationship between sellers and buyers was decidedly adversarial. This was his "red flag" to withdraw from the case if he had not already done so.

Their life savings were wiped out. They became unable to meet their obligations, totalling approximately $42,000. The record reflects that the standard collection methods were used against them. Throughout the trial and right through this appeal, they are still being pursued by creditors.

■■■ We hold this evidence was sufficient to support the jury's finding of damages. The trial court properly declined to grant a new trial or grant JNOV on damages, the equivalent of a remittitur. This court will overturn a trial court's refusal to decrease a jury's verdict on damages only on a showing that the trial court abused its discretion. *Sandt,* 301 Minn. at 477, 224 N.W.2d at 343:

> In determining whether a verdict is excessive, the trial judge must consider all the evidence, the demeanor of the parties, the circumstances of the trial, and in his discretion reduce the verdict if its amount is unsupported.

*Id.* at 476, 224 N.W.2d at 343 (citation omitted). A trial court may reduce a verdict to the highest dollar verdict permissible under the evidence, *id.,* by considering all of the evidence and circumstances of the trial. Here, the court properly declined to reduce the verdict.

We do not agree with appellant that the record is devoid of evidence of damage to the Gillespies' credit or reputation. Testimony showed that, prior to November 23, 1983, respondent Gary Gillespie ran a successful business and had never been sued. Uncontroverted testimony showed he had a good reputation. The confession of judgment entered against him became a matter of public record.

### IV.

*Damages for Emotional Distress*

Appellant argues no evidence supports the jury's $25,000 verdict for damages due to emotional distress. Respondents claim the tension and strife in their marriage, the mental health counseling, and their subsequent divorce are related to the financial strain of the apartment building and the unpaid bills.

Testimony by respondents and their therapists showed the 1980 counseling was successful and that the parties' marriage was stable prior to November 1983. The Gillespies' marital therapist testified she began counseling with the Gillespies on November 3, 1983, and saw Kim seven times between November 3, 1983, and January 10, 1984, for distress caused by the couple's financial difficulties with the apartment building.

■■■ Extra contractual damages are not recoverable for breach of contract unless the breach is accompanied by an independent tort. *Langeland v. Farmers State Bank of Trimont,* 319 N.W.2d 26, 31 (Minn.1982). We find evidence in the record to support a finding of appellant's negligence, and hold that the award of damages for emotional distress was proper. Respondents are not limited to breach of contract damages.

### V.

*Punitive Damages*

■■■ Citing no authority, appellant argues the jury's award of $25,000 punitive damages cannot stand.

> Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others.

Minn.Stat. § 549.20, subd. 1 (1984). The award of punitive damages is supported by the evidence. Under *Togstad,* the jury properly found an attorney-client relationship based on the conduct of the parties. Respondents' expert testified that once the dispute arose on November 23, 1983, appellant should have withdrawn from the case:

Q. What is the standard practice for an attorney in that situation in the Virginia, Ely area?

A. I am aware that the same situation occurs with many attorneys. I represent many attorneys; and I have access to their attorney-client files as part of the representation. General practice, and the standard practice for the attorney

that is in that type of a situation, that attorney must withdraw immediately, and that attorney must make a complete disclosure to both parties that that attorney is pulling out, that he can't represent; and he must disclose the reason that there's a conflict. The attorneys are bound to do that; can't do anything about that.

Appellant did not withdraw. He advised respondent Gary Gillespie that he could be sued if he did not sign the agreement. Taking that statement in context, the jury was justified in finding appellant showed willful indifference to the Gillespies' rights. Under these facts, appellant should have withdrawn from representing both parties.

Stall testified that the documents drawn by appellant for execution by respondents do not meet community standards. The confession of judgment improperly obligated respondents to the Riikolas for various debts relating to the apartment building, including back taxes and unpaid fuel bills. Respondents' expert Stall testified:

A. * * * no attorney could do what was done here in reference to the claim by Starkman [the fuel oil creditor], and judgment—having obtained a confession of judgment where there is no claim or interest or cause of action where the Riikolas might have any responsibility, or ever be called on to meet an obligation to any creditors such as Starkman * * *.

That the confession of judgment was later vacated without having been paid evidences its questionable nature. There is enough evidence to support the jury verdict for punitive damages.

## VI.

### Attorney Fees

▮ Respondents filed a notice of review asking this court to reverse the trial court's refusal to award bad faith attorney fees under Minn.Stat. § 549.21 (1984). Respondents argue appellant's defamation counterclaim was brought in bad faith solely to harass respondents, and that appellant presented him no evidence on his defamation claim. We do not agree.

Appellant elicited testimony from Gary Gillespie that Gillespie told several people in Ely that appellant "screwed" him. The question was submitted to the jury and the jury found respondent defamed appellant, although the jury also concluded appellant suffered no damage. Denial of an award of attorney fees can only be upset on a finding of abuse of discretion by the trial court. *See National Recruiters, Inc. v. Toro Co.*, 343 N.W.2d 704, 709 (Minn.Ct. App.1984). We find no abuse of discretion in the denial to respondents of bad faith attorney fees when the jury found defamation.

## VII

### Treble Damages

▮ Respondents sought treble damages under Minn.Stat. § 481.071 (1984) which states:

Every attorney * * * who shall be guilty of any deceit or collusion, or shall consent thereto, with intent to deceive the court or any party, * * * shall be guilty of a misdemeanor and * * * shall forfeit to the party injured treble damages, to be recovered in a civil action.

The judge refused to submit this issue to the jury finding no evidence that appellant conspired with the Riikolas to defraud respondents. We will not disturb this ruling on appeal.

## DECISION

The trial court did not err by refusing to grant a new trial or JNOV. The jury's findings were supported by the evidence. The trial court did not abuse its discretion in denying bad faith attorney fees and in refusing to submit the issue of treble damages to the jury.

Affirmed.