**McMAHON FOOD CORP., Plaintiff and Counterdefendant–Appellant,**

v.

**BURGER DAIRY CO., Defendant and Counterplaintiff–Appellee.**

No. 95–3974.

United States Court of Appeals, Seventh Circuit.

Argued May 13, 1996.

Decided Dec. 30, 1996.

Rehearing Denied Feb. 19, 1997.

John J. Lynch, John B. Murnighan (argued), Brittain, Sledz, Morris & Slovak, Chicago, IL, for Plaintiff–Appellant.

William J. Barrett (argued), Gardner, Carton & Douglas, Chicago, IL, for Defendant–Appellee.

Before CUDAHY, COFFEY, and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

Burger Dairy Company ("Burger") and McMahon Food Corporation ("MFC") were involved in a contract dispute over milk products that Burger sold to MFC, as well as credits for empty milk cases that MFC returned. MFC brought a declaratory judgment action against Burger, asserting that it effected an accord and satisfaction of its debt by tendering two checks with attached vouchers, one marked "payment in full through 6/6/92," the other marked, "paid in full thru 8/8/92," to Burger. Burger countersued, seeking $58,518.41 from MFC. The trial court denied MFC relief, ruling that the accord which the first check purported to

satisfy was obtained by deceit, while the second check was a unilateral action by MFC, on which the parties reached no accord. The court awarded Burger the full amount claimed. On appeal, MFC argues that (1) because the language "payment in full thru 6/6/92 ... Clear statement of account thru 6/6/92 to follow," inscribed on the first voucher, was clear and unambiguous, the district court wrongly admitted parole evidence to elucidate the negotiations leading up to its tender; and (2) under U.C.C. § 3–311, a second accord was reached when Burger objectively agreed to MFC's offer by cashing the second check. We are of the opinion that the trial court's findings of fact are not clearly erroneous. Therefore, we affirm.

## I. *Background*

Burger Dairy Company, an Indiana vendor of dairy products, regularly sold milk products to McMahon Food Corporation, a Chicago distributor of dairy products, from October, 1991, until August 15, 1992.[1] MFC generally placed several orders each week. Burger's product manager entered the orders onto a "load ticket," which the loading crew relied upon when shipping a truckload of plastic milk cases [2] for the respective order. If there was a discrepancy between the amount MFC ordered and the amount Burger was able to ship, the load ticket reflected that discrepancy, including the exact number of milk cases. Burger used the load tickets to itemize the charges in its invoices for MFC. In addition, to make sure that MFC returned Burger's plastic milk cases, Burger charged MFC a $1.00 deposit for each milk case delivered to MFC, and gave an equal credit for each case returned. Burger prepared and mailed a weekly invoice for MFC.

In addition to buying dairy products, MFC had a side-business selling used plastic milk cases to Burger. MFC had acquired a large stockpile of these cases from various suppliers, including Burger. Burger agreed that when MFC returned a truckload of cases to

its plant, it could add some of its "stockpiled" cases to the shipment, and Burger would credit MFC $1.00/case. Frank McMahon, MFC's vice-president, claimed that Burger did not give MFC sufficient credit for extra cases MFC returned. For this reason, when he paid Burger's invoices, McMahon deducted from his check the amount of credit he thought MFC was entitled to.

In contrast, Burger's general manager, Richard L. Bylsma, asserted that not only was MFC always late in its payments, but more frequently than not Burger had difficulty collecting. Bylsma also stated his belief that when Frank McMahon remitted payment, he made unauthorized deductions for dairy products shipped and delivered which he claimed not to have received. In addition, Bylsma maintained that MFC was shortchanging Burger, by consistently claiming credits for returning full truckloads of empty cases, while the count which Burger's loading-dock personnel made reflected only partial truckloads of returned cases: Burger did not give MFC the credit McMahon demanded, Bylsma asserted, because Burger never received the number of cases MFC claimed to have returned. These disputes over the unauthorized deductions for milk cases became a major source of friction between the two companies throughout the period of their business relationship. Burger's records indicated that by mid-February of 1992, MFC was in arrears $58,518.41 ("the February debt"). About half of this total was for unauthorized credits for returned milk-cases.

Bylsma, on behalf of Burger, met with Frank McMahon on February 27, 1992, to discuss MFC's account with Burger, including the February debt. The parties dispute the results of that meeting. Both parties agree that they examined the invoices in question, and ultimately agreed that Burger would no longer charge MFC a deposit for milk cases—according to Bylsma, in exchange for MFC's agreement to pay the invoices as they became due. Bylsma testified that he and McMahon did not otherwise resolve the amounts past due, nor did they

---

1. All of the meetings and other events relevant to this appeal took place in 1992. Similarly, except for one disputed claim covering the last three months of 1991, all relevant Burger invoices and letters, and MFC checks, date to 1992.

2. "Milk cases"—essentially open-topped plastic boxes—are widely used throughout the dairy industry to ship cartons of milk. Each case holds several cartons (half gallons, pints, etc.).

agree upon the amount of credit due for the empty milk cases allegedly returned.

Bylsma further claimed that he never agreed to excuse MFC from making payment in full for the past due accounts. Instead, he claims he made clear during their conversation, when he and McMahon were unable to reach an agreement, that they would simply table further discussion of the February debt at that time. Upon returning to Burger's plant and checking the records, Bylsma satisfied himself that the company had been giving MFC proper credit for the cases returned. Bylsma left Burger's employment shortly thereafter, without further communication with McMahon and MFC about the February debt. Burger's records reflect that after the February 27th meeting, it continued to bill MFC for the full $58,518.41 it claimed was in arrears at the time Bylsma and McMahon met. McMahon, in contrast, testified that he believed he had probably paid for some of the amount in arrears with a lump-sum check; that he had never received one of the shipments for which Burger billed him; and that MFC had returned a sufficient number of additional empty milk cases to make up for the amount which Burger claimed was due in February. Nonetheless, McMahon conceded that Bylsma told him he would have to return to Burger's headquarters and check the record there before he could straighten out the old charges and credits.

After the February meeting, MFC made full payments for three weeks of current purchases (nothing was done to pay off the February debt), but then made no further payments until May 13, 1992, when it remitted a $100,000 check to Burger with an accompanying voucher stating "on account detail to follow." Burger's records, however, reflected that the $100,000 covered less than half the debt that MFC had amassed by that time, including the $58,518.41 February debt which was the subject of McMahon's meeting with Bylsma.

## II. The June 17th Check

### A. Background

Larry Carter, who replaced Bylsma as Burger's general sales manager about the first of May, 1992, met with McMahon on June 17, 1992, to review MFC's account. McMahon asserts that at the beginning of the meeting he told Carter that if they could agree on the amount that MFC owed, he would pay it on the spot. According to Carter's notes, made contemporaneously during the June 17th meeting, McMahon assured Carter that he had settled the February debt with Bylsma. Carter's notes included both a reminder to himself to call Bylsma to confirm McMahon's assertion, and a statement that McMahon "want[ed] a new statement of account reflecting these events."[3] Accordingly, Carter and McMahon went through only the invoices dated February 15 through June 6, 1992. They determined that MFC still owed a balance of $51,812.98. McMahon promptly made out a check to Burger for that amount. He attached a voucher to the check on which was typed, "payment in full thru 6/6/92 ... $51,812.98." Below the typed language McMahon added a handwritten note stating, "Clear statement of account thru 6/6/92 to follow," followed by his signature. Burger never sent McMahon the "statement of account." McMahon also asked Carter to sign the voucher as a condition of receiving the check, which Carter did without protest. At the end of his notes, Carter wrote, "current to 6–6–92."

After returning to Burger, Carter contacted Bylsma, who told Carter that he had never reached an agreement with McMahon about the February debt. Thereafter, sometime before the end of June, Carter called McMahon and told him that it was Burger's position that the February debt had not been settled. When McMahon replied that he refused to pay the February debt, and continued to insist that he had settled it with Bylsma, Carter held McMahon's June 17th check throughout the summer of 1992.

On September 24, Edward J. Geoghan, Burger's accounting manager and comptrol-

---

**3.** The district court, interpreting Carter and McMahon's testimony, concluded that "these events" referred to the June 17th agreement with Carter and the alleged agreement with Bylsma regarding the February debt. The notation meant that Burger was to supply MFC with a new statement reflecting the two agreements, and showing that MFC's account was no longer in arrears.

ler of Burger's parent company, negotiated the June 17th check. Before doing so, and without consulting with Carter, Geoghan crossed out MFC's restrictive endorsement "payment in full" and "full statement of account to follow" from the voucher, and added the notation "without prejudice," followed by his own signature. Geoghan later testified that he struck out the language on the voucher because he knew it was insufficient to make MFC's account current. The next day, Geoghan wrote to McMahon, informing him that the check had been cashed, the restrictive endorsement stricken, and that MFC still owed Burger over $64,000.

On January 14, 1993, MFC filed suit against Burger, asking the federal district court to issue a declaratory judgment that it had reached an accord and satisfaction relieving it of any debt to Burger. Burger countersued, seeking the money which it claimed MFC still owed. With the consent of the parties, the case was tried before a magistrate judge without a jury. The trial court found MFC in arrears and awarded Burger damages in the amount of $58,518.41, plus interest and costs. This appeal followed.

### B. Analysis

#### 1. Uniform Commercial Code § 3–311

■ Initially, MFC argues that Burger's negotiation of the check which McMahon tendered to Carter at their June 17th meeting constituted an accord and satisfaction. An accord and satisfaction is a contractual method of discharging a debt: the "accord" is the agreement between the parties, while the "satisfaction" is the execution of the agreement. *Fremarek v. John Hancock Mutual Life Ins. Co.*, 272 Ill.App.3d 1067, 209 Ill.Dec. 423, 427, 651 N.E.2d 601, 605 (1995). The parties accept that Illinois law, including Illinois' enactment of the Uniform Commercial Code, governs the case at bar.

Shortly before this dispute arose, Illinois adopted a revised version of Article Three of the Uniform Commercial Code, including a new section specifically addressing the creation of an accord and satisfaction by use of a negotiable instrument. 810 ILCS 5/3–311 (1992). Section 3–311 provides:

(a) If a person against whom a claim is asserted proves that (i) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument, the following subsections apply.

(b) Unless subsection (c) applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.

(c) Subject to subsection (d), a claim is not discharged under subsection (b) if either of the following applies:

(1) The claimant, if an organization, proves that (i) within a reasonable time before the tender, the claimant sent a conspicuous statement to the person against whom the claim is asserted that communications concerning disputed debts, including an instrument tendered as full satisfaction of a debt, are to be sent to a designated person, office, or place, and (ii) the instrument or accompanying communication was not received by that designated person, office, or place.

(2) The claimant, whether or not an organization, proves that within 90 days after payment of the instrument, the claimant tendered repayment of the amount of the instrument to the person against whom the claim is asserted. This paragraph does not apply if the claimant is an organization that sent a statement complying with paragraph (1)(i).

(d) A claim is discharged if the person against whom the claim is asserted proves that within a reasonable time before collection of the instrument was initiated, the claimant or an agent of the claimant having direct responsibility with respect to the disputed obligation knew that the instrument was tendered in full satisfaction of the claim.

810 ILCS 5/3–311. The purpose of § 3–311 is to encourage "informal dispute resolution

by full satisfaction checks." U.C.C. § 3–311, comment 3. Its drafters intended to codify the common law of accord and satisfaction "with some minor variations to reflect modern business conditions." *Id.*

In the case at bar, Burger does not dispute that the voucher attached to MFC's June 17th check contained a conspicuous notation that it was tendered as full satisfaction of MFC's entire debt, thus satisfying the prerequisites of § 3–311(b) (*supra*) for discharging the claim. Neither did Burger follow the procedures which §. 3–311(c) (*supra*) establishes to keep a claim from being discharged: it neither instructed MFC to send any full satisfaction checks to a specific person or office, nor sought to repay MFC after it deposited the check. 810 ILCS 5/3–311(c)(1)–(2). Furthermore, Geoghan's attempt to cash MFC's check without jeopardizing Burger's claim against MFC was improper under the U.C.C. Assuming there was an accord, Geoghan's bid to prevent a satisfaction by accepting the check but scratching out the restrictive endorsement and adding the words "without prejudice" before he cashed the check was to no avail, for under the revised version of the U.C.C., words of protest cannot change the legal effect of an accord and satisfaction. 810 ILCS 5/1–207(2). Accordingly, MFC argues, because the voucher clearly stated that the instrument was a full satisfaction check, and because Geoghan clearly understood that the check was tendered in full satisfaction of MFC's claim before he deposited it, Burger's acceptance and negotiation of the check completed the accord and satisfaction.

We disagree. Initially, under the plain language of the statute, in order to establish an accord and satisfaction, MFC bore the burden of establishing that it met the criteria of § 3311(a) before the other subsections establishing the discharge of a claim come into play. 810 ILCS 5/3–311(a). To meet the criteria of § 3311(a) under Illinois law, "a party must ordinarily prove that he or she acted in good faith *in tendering* an instrument as full satisfaction of a claim[.]" *Fremarek*, 209 Ill.Dec. at 427, 651 N.E.2d at 605 (emphasis added). Thus, Illinois courts interpreting § 3–311 follow the common law

of accord and satisfaction in holding that "there must be an honest dispute between the parties as to the amount due *at the time payment was tendered.*" *A.F.P. Enterprises, Inc. v. Crescent Pork, Inc.*, 243 Ill.App.3d 905, 183 Ill.Dec. 356, 360, 611 N.E.2d 619, 623 (1993) (emphasis added). Consequently, under Illinois law, there can be no accord and satisfaction unless there was an "honest dispute" between MFC and Burger at the time McMahon tendered the $51,812.98 check to Carter on June 17th. No such "honest dispute" existed.

The trial court found that McMahon deliberately misled Carter, who had but recently been appointed to his position of general manager and did not know the specifics of his predecessor's dealings with MFC. McMahon did so, according to the court, by assuring Carter from the outset of their June 17th meeting that he had settled with Bylsma, the former general manager, all accounts prior to mid-February, 1992. The court found that McMahon was acting dishonestly and taking advantage of Carter at the time he tendered payment, and therefore MFC failed to meet the good faith requirement of § 3–311(a).[4] A trial court's conclusion that a party failed to act in good faith is a finding of fact which we reverse only for clear error. *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 662 (7th Cir. 1992); *Winters v. Dallman*, 238 F.2d 912, 914 (7th Cir.1956). We find no such error in the case before us.

MFC protests that the court based its conclusions only on Carter's understanding of what happened at the June 17th meeting. MFC denies that McMahon misled Carter, and argues that at trial, it presented evidence to the court that McMahon believed he fully settled matters with Bylsma. This assertion amounts to nothing more than an argument that the trial court should have believed MFC's version of events rather than Burger's, even though the trial court specifically found that McMahon's testimony was less credible than the testimony of Carter and Bylsma. We give "[s]pecial deference ... to [a trial court's] findings based upon credibility determinations, which 'can virtual-

---

4. Article Three of the Uniform Commercial Code defines "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing." 810 ILCS 5/3–103(4).

ly never be clear error.'" *United States v. Hickok,* 77 F.3d 992, 1007 (7th Cir.) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)), *cert. denied,* —— U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996). Indeed, as *Anderson* explains, "[i]f the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, [an appeals court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." 470 U.S. at 573–74, 105 S.Ct. at 1511. Because MFC presented the same credibility arguments to the trial court, we defer to the factfinder's determination. *See United States v. Wimberly,* 79 F.3d 673, 676 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 164, 136 L.Ed.2d 107 (1996).

## 2. Parel Evidence

 In a final attempt to escape the trial court's conclusion that no accord and satisfaction resulted from the June 17th meeting, MFC argues that because the June 17th check (with its accompanying voucher) was unambiguously a full satisfaction check, the parol evidence rule should have barred the court from admitting any evidence concerning the meeting which led up to McMahon's tendering it. Without evidence of the contents of the June 17th meeting as well as its aftermath, MFC notes (correctly), the court could not have found that MFC acted deceptively and in bad faith.

 This argument embodies an elementary mistake concerning the scope of the parol evidence rule under the Uniform Commercial Code. As this court has long recognized, Illinois common law follows the practice of insisting that parol evidence "is only admissible at trial, for consideration by the trier of fact, if the trial court determines, as a matter of law, that the contract is ambiguous." *Sunstream Jet Express, Inc. v. International Air Service Co.,* 734 F.2d 1258, 1268 (7th Cir.1984). Recently, however, the Supreme Court of Illinois explicitly stated that in cases which the U.C.C. governs—though only in U.C.C. cases—Illinois follows the more liberal standard of the Restatement (Second) of Contracts § 214, that parol evidence is admissible to determine whether an agreement is completely or partially integrated, and to explain the meaning of even a fully integrated agreement. *J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc.,* 162 Ill.2d 265, 205 Ill.Dec. 98, 102, 642 N.E.2d 1215, 1219 (1994) (citing Restatement (Second) of Contracts § 214[5] and 810 ILCS 5/2–202). Indeed, under the U.C.C., "in order to determine whether the parties intended a writing to be the complete and exclusive agreement between them, a court must compare the writing with the prior negotiations." *L.S. Heath & Son, Inc. v. AT & T Information Systems,* 9 F.3d 561, 569 (7th Cir.1993). And even under the common law, parol evidence is always admissible to prove a fraud or deceit. *Herzog Contracting Corp. v. McGowen Corp.,* 976 F.2d 1062, 1068 (7th Cir.1992). As stated above, the U.C.C. unquestionably governs the case at bar. Consequently, testimony concerning the June 17th meeting was admissible to show that the accord which the parties reached as a result of that meeting fell short of fulfilling the requirement for a good faith, arms-length negotiation—an "other invalidating cause" within the meaning of the Restatement (Second) of Contracts § 214(d). Because we are convinced that the trial court did not clearly err in finding that McMahon demonstrated a lack of good faith, MFC has failed to present facts sufficient to convince us that it complied with the requirements for an accord and satisfaction under the U.C.C.

---

**5.** The Restatement (Second) of Contracts § 214 reads in pertinent part:

"Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish

(a) that the writing is or is not an integrated agreement;

(b) that the integrated agreement, if any, is completely or partially integrated;

(c) the meaning of the writing, whether or not integrated;

(d) illegality, fraud, duress, mistake, lack of consideration, or other invalidating cause;

(e) ground for granting or denying rescission, reformation, specific performance, or other remedy."

### III. *The August 18th Check*

#### A. Background

Despite the conflict which arose when McMahon refused to pay the February debt, MFC continued to purchase milk from Burger through August 15, 1992. On August 18th, MFC sent two checks to Burger. The first check paid off three invoices dated July 4th, 11th, and 18th, while the second check covered invoices from July 25th, August 1st, and August 8th. A voucher accompanying each check listed the invoices being paid, and the deductions which MFC was making. The voucher accompanying the second of the two checks dated August 18, 1992, bore a list reflecting that MFC was paying off three specified invoices, and also deducting $1,758.46 for milk cases for which MFC believed it should receive credit. Typed in capital letters at the bottom of this list was the notation, "PAID IN FULL THRU 8/8/92." Burger immediately deposited both checks without further inquiry, as well as a check the following week for an August 15 invoice whose accompanying voucher also included a line stating, "PAYMENT IN FULL THRU 8/15/92." Denise Blough, Burger's assistant controller, testified that she received and deposited the two checks without noticing the "payment in full" language on the attached voucher. She added that it was her habit to examine the checks themselves, but that she ignored the memos or vouchers accompanying payments.

#### B. Analysis

MFC contends that the company tendered its check of August 18th, with the accompanying voucher marked "payment in full," as an intended full satisfaction check within the meaning of § 3311 (*supra*), and Burger completed an accord and satisfaction when it cashed the check. The dispute over the February debt, MFC reasoned, had come out into the open at the end of June, when McMahon told Carter he would not pay it, thus creating a good faith dispute within the meaning of § 3–311(a). MFC argues that as a result, Burger should have realized that after the end of June, any check marked "payment in full" was meant to settle all outstanding disputes between the parties. The trial court, in contrast, concluded (and the record is barren of evidence to the contrary) that the August 18th check constituted an accord and satisfaction only for those invoices to which the accompanying voucher made reference, because Burger expressed no objective intent to enter into an accord for any other period. We agree with the trial court's conclusion, but for different reasons.

As previously noted, the principal purpose of § 3–311 was to encourage informal dispute resolution by full satisfaction checks. U.C.C. § 3–311, comment 3. The law of accord and satisfaction has long recognized that "[w]here [an] amount due is in dispute, and the debtor sends [a] check for less than the amount claimed, clearly expressing that it is sent as settlement in full ... [the] cashing of the check is almost always held to be an acceptance of the offer operating as full satisfaction." 6 Corbin on Contracts § 1279. As a result, the objective act of cashing a full payment check may, by itself, be deemed an acceptance of an accord. *See Nelson v. Fire Ins. Exchange*, 156 Ill. App.3d 1017, 109 Ill.Dec. 516, 518, 510 N.E.2d 137, 139 (1987); *A.F.P. Enterprises v. Crescent Pork*, 183 Ill.Dec. at 360–61, 611 N.E.2d at 623–24.

Nevertheless, before a full satisfaction check can create an accord and satisfaction, the party who offers or presents the check must make it clear that the cashing of the check is intended to act as a settlement of all outstanding claims between the parties. 810 ILCS 5/3–311(b). We are convinced that MFC's actions in tendering the August 18th check were not sufficiently clear to make Burger aware that the check was meant to settle all MFC's outstanding claims. First, it is significant that MFC actually tendered not one but two checks dated August 18th. Both were in payment for invoices billed after McMahon made Carter aware of the fact that he would not pay the February debt; each check included a deduction for empty milk cases for which MFC believed it was entitled to receive credit. Only one of the two checks, however, bore the notation "paid in full." In addition, the restrictive language, although typed in capital letters, was simply the last of several lines of information inscribed on the voucher accompanying the check, reflecting the items included for payment.

As noted above, an accord and satisfaction is a "contractual method of discharging a debt," *Fremarek*, 209 Ill.Dec. at 427, 651 N.E.2d at 605, and like any contract the intentions of the parties must be viewed objectively. Viewing the record as a whole, it is objectively reasonable to conclude that MFC intended the August 18th check to be full payment only for those invoices to which the accompanying voucher made reference. The parties' long history of disputes over credits for empty milk cases makes this conclusion seem even more likely. Otherwise, it is difficult to understand why MFC would not have applied the "paid in full" notation to both of the checks it issued on August 18th, instead of just one. Thus, since the "paid in full" language on the August 18th check was at best ambiguous, its tender cannot serve as full satisfaction of Burger's claim against MFC.

Second, even if the "paid in full" language were clear, we refuse to impute to Burger knowledge that MFC intended the August 18th check as full satisfaction of its claim. MFC never contested the statement of Denise Blough, the Burger official who deposited the August checks, that she simply did not notice the "paid in full" language on the voucher accompanying the August 18th check. Though hardly dispositive, this is probative of the fact that the "paid in full" language was not sufficiently conspicuous. *See* 810 ILCS 5/1–201(10) (a statement is conspicuous if "it is so written that a reasonable person against whom it is to operate ought to have noticed it").[6] Moreover, MFC never refuted Blough's deposition testimony that she would not have understood the significance of the notation unless Carter had told her. Instead, MFC argued that if Carter had exercised due diligence regarding the dispute over MFC's account, he would have informed Blough of the problem and told her to be on the lookout for precisely the sort of check which MFC tendered.

The problem with this argument is that the drafters of § 3–311 have anticipated and rejected it. Where a person who processes a company's checks has no responsibility with respect to an accord and satisfaction, it makes no difference whether that person "did or did not see [a] statement that [a] check was tendered as full satisfaction of the claim;" the person's knowledge "is not imputed to the organization" for which she works. 810 ILCS 5/3–311, comment 7. Failure to instruct the person who processes the organization's checks to look for full satisfaction statements falls short of constituting a lack of due diligence on the part of the creditor. *Id.* (citing U.C.C. § 1–207(27)). It is true that Blough held a far more responsible position with Burger than, for example, the clerical workers in the examples discussed in the commentary to § 3–311. It is also clear, however, that those comments are illustrative rather than exhaustive. Furthermore, MFC never introduced into the record evidence demonstrating that Blough's duties regarding accounts receivable extended beyond examining the face of a check and then processing it, or that she had responsibility with respect to any accord and satisfaction which Burger might reach with its customers.

Thus, based on the record before us, we cannot impute knowledge of the August 18th full payment check to Carter—who, as the person with direct responsibility for the dispute with MFC, would have realized that the check was tendered as full satisfaction of Burger's claim. 810 ILCS 5/3–311(d) and comment 7. The Uniform Commercial Code, in effect, delineates when knowledge of a full satisfaction tender may be imputed to a claimant. *See* U.C.C. §§ 3–311, comments 3, 7; 1201(25), 1–201(27). Thus, the statute accommodates modern business practices in receiving and processing checks, 810 ILCS 5/3–311, comment 3, while the cumulative result of its provisions is to preserve the common law rule that a debtor cannot unilat-

---

6. The statute allows the claimant to place such a statement either on the check itself or on an accompanying written communication. 810 ILCS 5/3311(b). A "paid in full" notation placed on the check itself would have been more conspicuous than the same statement on the accompanying voucher. Similarly, had MFC used more explicit language, *see Rang v. Hartford Variable Annuity Life Ins. Co.*, 908 F.2d 380, 381 (8th Cir.1990) (reading in part "the endorsement of this check by payee constitutes a clear release in full settlement of the stated accounts"); *Air Van Lines, Inc. v. Buster*, 673 P.2d 774, 777 (Alaska 1983) (notation reading "full and complete payment.... Endorsement of this check constitutes a complete settlement of your claim"), we might have been constrained to reach a different result.

erally create an accord and satisfaction. *Shea, Rogal & Assoc. v. Leslie Volkswagen, Inc.*, 216 Ill.App.3d 66, 159 Ill.Dec. 540, 543–44, 576 N.E.2d 209, 212–13 (1991). Because MFC failed to establish a sufficient foundation from which to impute knowledge of the full satisfaction tender to Burger, we hold that Burger's depositing of the August 18th check failed to create an accord and satisfaction as defined by U.C.C. § 3–311.

 Finally, despite MFC's assertion to the contrary, we cannot agree that just because the conflict over the February debt was out in the open by the end of June, MFC acted in good faith when it tendered the August 18th check as full satisfaction of its outstanding debt to Burger. As noted above (Section II.B.1), the existence of a good faith dispute between the parties is a prerequisite to an accord and satisfaction under the U.C.C. 810 ILCS 5/3–311(a). There was no such underlying good faith dispute because, as noted above, McMahon misled Carter about having settled MFC's February debt. That McMahon later made a statement to Carter that he wouldn't pay the February debt is not, of itself, sufficient to create a good faith dispute within the meaning of the statute:

> The debtor's mere refusal to pay the full claim does not make it a disputed claim. Where the refusal is arbitrary and the debtor knows it has no just basis, the payment of less than the full amount claimed does not operate as an accord and satisfaction even though it is tendered and received as such.

*Gerald R. Turner & Assoc. v. Moriarty*, 25 F.3d 1356, 1360 (7th Cir.1993). Thus, it is not enough for MFC to demonstrate that it openly refused to pay the February debt: MFC must also show that it had a just basis for refusing to pay. Under the *Turner* rationale, the trial court's findings concerning MFC's lack of good faith at the June 17th meeting between Carter and McMahon carry over into our analysis of MFC's later actions. As stated above, the trial court concluded that MFC proffered no credible reasons for believing it did not have to pay the February debt. Because after review we are convinced that this finding was not clearly erroneous, supra, we conclude that MFC has failed to carry its burden of establishing that there was a just basis for its dispute with Burger. Since MFC had no more basis for its refusal

to pay the February debt in August than it had in June, there was no good faith dispute between the parties within the meaning of U.C.C. § 3–311, and the August 18th check cannot operate as an accord and satisfaction.

### CONCLUSION

The trial court did not clearly err in concluding that MFC's first tender marked "paid in full" did not effect a satisfaction, because the accord which it purported to satisfy was reached only as a result of MFC's bad faith and deception. The court's admission of parole evidence in order to demonstrate MFC's lack of good faith was proper under Illinois' enactment of the U.C.C. Neither did the second tender satisfy MFC's debt to Burger, because MFC failed to make it sufficiently clear that depositing the check would settle all outstanding disputes between the parties. The district court's determination that neither tender was a full satisfaction check within the meaning of U.C.C. § 3–311, and MFC was not entitled to declaratory relief, was proper.

AFFIRMED.