**WEBB BUSINESS PROMOTIONS, INC., Respondent,**

v.

**AMERICAN ELECTRONICS & ENTERTAINMENT CORP., petitioner,**

**Appellant.**

No. C2–99–269.

Supreme Court of Minnesota.

Sept. 14, 2000.

Katherine L. Mackinnon, St. Louis Park, for appellant.

Kay Nord Hunt, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, for respondent.

## OPINION

LANCASTER, Justice.

This is an action for breach of contract between appellant, American Electronics & Entertainment Corp. (AE&E) and respondent, Webb Business Promotions, Inc. (Webb). Webb sued AE&E for breach of contract. AE&E asserted the affirmative defense of accord and satisfaction under Minn.Stat. § 336.3–311 (1998).[1] Following a court trial, the district court found that there was no accord and satisfaction, concluding that there was an absence of good faith in the tender and no mutual agreement. The court of appeals affirmed, holding that mutual agreement is not required for an accord and satisfaction. We reverse the court of appeals and remand the matter to the district court.

We are presented in this case with two questions: First, did the district court err in imputing AE&E's bad faith in the underlying sales contract to AE&E's offer of an accord and satisfaction? Second, did the court of appeals err in holding that because mutual agreement is not explicitly enumerated in Minn.Stat. § 336.3–311, such agreement is not necessary to create an enforceable accord and satisfaction?

On May 16, 1995, AE&E entered into a contract with Target Corporation (Target).

The agreement called for Target to purchase 300,000 units of three-pack MGM blank videotapes from AE&E, and AE&E was to provide 300,000 units of promotional merchandise (calendars, pencils and the like) as a "free gift with purchase" with each pack of videotapes. Subsequently, on May 24, 1995, AE&E executed a written contract with Webb in which Webb agreed to provide the 300,000 units of promotional merchandise to AE&E at a contract price of $684,000. In order to fulfill its part of the agreement between Webb and AE&E, Webb borrowed approximately $400,000 from First National Bank of Farmington, which in turn acquired a right of assignment of all funds due to Webb from AE&E. The contract between AE&E and Webb provided that AE&E would be responsible for any and all defects with respect to the MGM blank videotapes, that Webb would be expected to absorb $30,000 in advertising, packing, and shipping costs, and that delivery of the promotional merchandise was due on or before July 15, 1995.

On May 24, 1995, AE&E sent Webb purchase order # 604 for the 300,000 units of promotional merchandise. Purchase order # 604 specifically stated that it was "conti[n]gent upon Target['s] purchase order" with AE&E. Target's agreement with AE&E permitted Target to cancel its purchase order if the product was not up to Target's quality standards or at Target's sole convenience any time prior to shipping. AE&E never informed Webb of the conditions under which Target could cancel its purchase order with AE&E.

On May 4, 1995, more than two weeks before Webb entered into its contract with

---

1. Minnesota Statutes § 336.3–311 provides in relevant part:

   (a) If a person against whom a claim is asserted proves that (i) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument, the following subsections apply.

   (b) Unless subsection (c) applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.

AE&E, Target requested that AE&E submit a sample of the MGM videotapes for quality testing. AE&E complied with the request. On May 31, 1995, approximately two weeks after Target issued its purchase order to AE&E, the quality testing service recommended that Target "stay away" from the MGM brand of videocassette "until they improve their quality." Target immediately notified AE&E that the tapes failed the quality test. On June 9, 1995, AE&E requested and Target agreed to retest the videotapes at AE&E's expense. On June 23, 1995, the quality tester sent Target a second report, stating that the tapes were "satisfactory," but still had problems with consistency.

A few days prior to the July 15, 1995, delivery date for the promotional merchandise to AE&E from Webb, Target notified AE&E that it was canceling the transaction. In response, AE&E sent a representative to Target in an attempt to renegotiate the deal with Target. AE&E never notified Webb of the failed quality tests. AE&E was successful in renegotiating the deal but was only able to persuade Target to purchase 85,000 units of the videotape and promotional merchandise combination, instead of the 300,000 units originally agreed to. At trial, a Target representative testified that the primary reason for the reduction in the order was the poor test results of the MGM videotapes, but Target also considered the recent reduction in industry sales of blank videotapes.

On July 20, 1995, six days after the 300,000 units of promotional merchandise had arrived at the packaging location, AE&E sent a letter notifying Webb that based on Target's cancellation and renegotiation of its purchase order, AE&E was canceling its order with Webb and would thereafter place orders with Webb on a weekly basis. Alan Webb,[2] not knowing the terms of the arrangement between AE&E and Target, requested that AE&E cancel the order entirely and sue Target for breach. Alan Webb then contacted

First National Bank of Farmington to let it know the status of the deal with AE&E. The bank directed him to follow through with the replacement order.

Webb ultimately agreed to deliver 85,000 units to AE&E based on Target's order to AE&E, although AE&E never issued an additional purchase order to Webb. Upon delivery, Webb submitted invoice # 11374 to AE&E for approximately $190,000 for payment by August 24, 1995. On September 20, 1995, because Webb had not yet received payment for invoice # 11374, Alan Webb placed a phone call to AE&E's vice president, Linda Tsai. Alan Webb requested immediate payment of the invoice. In response, Tsai asserted that the invoice was incorrect and that AE&E would deduct various costs from the payment, which would result in a payment of approximately $150,000 for the 85,000 units of promotional merchandise.

On September 20, 1995, AE&E sent a letter to Webb explicitly referencing purchase order # 604, referring to terms of the original May 24, 1995, agreement, and informing Webb that AE&E intended to deduct certain amounts for re-packaging and shipping from the total amount owed to Webb based upon the May 24 agreement. The letter also stated that AE&E intended to pay Webb on September 21, 1995, and that "[b]y accepting and cashing the check, Webb is assumed to agree that this is the final settlement and AE&E will owe nothing to Webb." On September 21, 1995, AE&E submitted a check as payment to Webb in the amount of $150,677. The check was accompanied by a letter stating in part, "[p]er our phone conversation * * * I am sending you the check as your favor [sic] * * *. Please be awared [sic] that this is a final check, **AE&E will have no obligation to Webb as long as the check is cashed by Webb**." After discussions regarding Alan Webb's concerns about accepting the check, First National Bank told him to accept the check. Alan

2. Alan Webb is the president and sole share-holder of Webb Business Promotions.

Webb therefore accepted and deposited the check and gave the funds to the bank. In November 1995, AE&E sent a check for approximately $3,000 to Webb as a refund for unspent funds that it had withheld for shipping and packing costs.

Webb brought suit for breach of contract against AE&E seeking recovery of money due to him under the May 24, 1995, agreement as originally stated in purchase order # 604. AE&E asserted the affirmative defense of accord and satisfaction. At trial Webb asserted that the check for $150,677 was accepted to resolve the dispute surrounding the second agreement for delivery of the 85,000 units, and was *not* intended to resolve the claims relating to AE&E's breach of the first agreement for 300,000 units referenced by purchase order # 604. Further, Webb asserted that the check offering the accord and satisfaction was tendered in bad faith because AE&E had purposely withheld information from Webb with respect to the testing of the videotapes and because AE&E misinformed Webb about the terms of the contract between AE&E and Target. AE&E responded that the check and the accompanying communications clearly referenced purchase order # 604 and the May 24 agreement, and stated that the payment was intended to resolve all claims that Webb had against AE&E. AE&E argued that the original purchase order was expressly contingent on Target's order to AE&E and it was therefore entitled to reduce the amount of the order based on Target's change in its order to AE&E.

The district court found that AE&E breached its contract with Webb by anticipatory repudiation, that Webb did not know that Target's order with AE&E was cancelable at any time, and that AE&E's agent withheld the truth from Webb regarding the poor quality of the videotapes. The district court went on to find that if Webb had known of the quality failure of the videotapes when it first occurred, it could have ceased delivery as early as May 31, 1995. The district court concluded that

AE&E acted in bad faith by wrongfully concealing material facts from Webb by failing to reveal: Target's request to test the tapes in early May 1995; the terms of sale and conditions of the contract between AE&E and Target; the true reason why Target cancelled its purchase order on July 14, 1995; and the results of the quality assurance tests. The court also found that AE&E acted in bad faith by affirmatively representing to Webb that the tape quality had never been questioned by Target. Finally, the court concluded that the parties did not mutually agree that Webb was accepting the payment in full satisfaction of all outstanding claims. The district court therefore held that Webb's acceptance of AE&E's check for $150,677 did not constitute an accord and satisfaction.

The court of appeals held that the district court did not err in concluding that there was no accord and satisfaction because AE&E tendered its check with the knowledge that there were "outstanding obligations in dispute," and therefore the accord and satisfaction check was not tendered in good faith. *Webb Bus. Promotions, Inc. v. American Elecs. & Entertainment Corp.*, No. C2–99–269, 1999 WL 810452, at *7 (Minn.App. Oct.12, 1999). The court of appeals also held that mutual agreement is not required for an accord and satisfaction. *See id.*

I.

An accord is a contract in which a debtor offers a sum of money, or some other stated performance, in exchange for which a creditor promises to accept the performance in lieu of the original debt. *See Don Kral Inc. v. Lindstrom*, 286 Minn. 37, 39, 173 N.W.2d 921, 923 (1970). *See generally* Restatement (Second) of Contracts § 281 (1981); 6 Arthur L. Corbin, *Corbin on Contracts* § 1276 (West 1962). The satisfaction is the performance of the accord, generally the acceptance of money, which operates to discharge the debtor's duty as agreed to in the accord. *See Don Kral Inc.*, 286 Minn. at 39, 173 N.W.2d at

923. *See generally* Restatement (Second) of Contracts § 281; 6 Corbin, *supra,* § 1276. The purpose of accord and satisfaction is to allow parties to resolve disputes without judicial intervention by discharging all rights and duties under a contract in exchange for a stated performance, usually a payment of a sum of money. *See* U.C.C. § 3–311 cmt. 3 (1990), *reprinted in* Minn.Stat. Ann. § 336.3–311 (West.Supp.2000) ("Section 3–311 is based on a belief that the common law rule produces a fair result and that informal dispute resolution by full satisfaction checks should be encouraged."). *See generally Weed v. Commissioner of Revenue,* 550 N.W.2d 285, 288 (Minn.1996); *Roaderick v. Lull Eng'g Co.,* 296 Minn. 385, 389, 208 N.W.2d 761, 764 (1973).

■ An enforceable accord and satisfaction arises when a party against whom a claim of breach of contract is asserted proves that (1) the party, in good faith, tendered an instrument to the claimant as full satisfaction of the claim; (2) the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim; (3) the amount of the claim was unliquidated or subject to a bona fide dispute; and (4) the claimant obtained payment of the instrument.[3] *See* Minn.Stat. § 336.3–311(a)–(b).[4]

■ AE&E claims the district court erred in finding that it did not offer the accord in good faith. The district court found that AE&E acted in bad faith

through several concealments and misrepresentations regarding the quality testing, AE&E's contract with Target, and the reasons for cancellation. The district court found that AE&E breached its contract with Webb, the breach was in bad faith, and therefore the tender of the check to Webb by AE&E in offering the accord and satisfaction was in bad faith.

■ Whether there has been an accord and satisfaction is a question of fact. *See Bloomer v. Bloomer,* 289 Minn. 481, 484, 185 N.W.2d 520, 522 (1971). The findings of the trial court, as the trier of fact, will not be reversed on appeal unless they are "manifestly and palpably" contrary to the evidence. *Butch Levy Plumbing and Heating, Inc. v. Sallblad,* 267 Minn. 283, 293, 126 N.W.2d 380, 387 (1964). However, "[f]indings of fact which are controlled or influenced by error of law are not final on appeal and will be set aside." *In re Holden's Trust,* 207 Minn. 211, 227, 291 N.W. 104, 112 (1940).

■ Good faith is demonstrated when the party tendering the instrument offers a check with the intent to honestly enter into an accord and satisfaction while observing reasonable commercial standards of fair dealing. *See* Minn.Stat. § 336.3–103(a)(4) (1998). The focus of the good faith inquiry is on the offer of the accord, and not on the actions of the parties in performing the underlying contract. *See* Minn.Stat. § 336.3–311(a)(i); *cf.* U.C.C. § 3–311 cmt. 4 (1990), *reprinted in* Minn. Stat. Ann. § 336.3–311.[5]

3. Subsections (c) and (d) of the statute except certain situations from a binding accord and satisfaction, but those situations are not alleged to apply here. *See* Minn.Stat. § 336.3–311(c)–(d) (1998).

4. In 1990 the common law doctrines of accord and satisfaction were codified into section 3–311 of the U.C.C. which, in turn, was adopted by the legislature in 1992. *Cf.* U.C.C. § 3–311 cmt. 3, *reprinted in* Minn.Stat. Ann. § 336.3–311 (noting section 3–311 follows the common law rule with minor variations to reflect modern business conditions); Act of

Apr. 24, 1992, ch. 565, § 39, 1992 Minn. Laws 1816, 1842, *codified at* Minn.Stat. § 336.3–311 (1998); 6 Corbin, *supra,* § 1279 (outlining common law requirements for accord and satisfaction).

5. All of the examples of bad faith tender in the comments to section 3–311 of the U.C.C. relate solely to the offer of the accord, not to any conduct relating to the underlying contract. The examples are as follows:

For example, suppose an insurer tenders a check in settlement of a claim for personal injury in an accident clearly covered by the

Bad faith is not necessarily established by a failure to disclose facts about the underlying dispute that would have led to rejection of the offer of an accord. By accepting a certain sum of money to discharge a debt, the creditor waives a cause of action relating to the original debt. *See Roaderick,* 296 Minn. at 389, 208 N.W.2d at 764; *Weed,* 550 N.W.2d at 288; *see also Youngstown Mines Corp. v. Prout,* 266 Minn. 450, 463, 124 N.W.2d 328, 338 (1963) ("In order for an accord and satisfaction to exist, there must be an honest dispute between the parties, [and] a tender with the explicit understanding of both parties that it was in full payment of *all* demands * * *." (emphasis added)). Therefore, part of the consideration for the accord is the creditor's waiver of claims that may entitle it to more than what the debtor is offering in the accord. Once the creditor accepts the accord and performs the satisfaction, the validity of the accord and satisfaction may not be challenged unless the party challenging the accord can demonstrate that the elements of the accord and satisfaction have not been satisfied. *See Don Kral Inc.,* 286 Minn. at 39–40, 173 N.W.2d at 923 (stating that where an accord constitutes a binding contract, the original liability is discharged, but where the accord is not fully performed, the original liability remains).

In support of their arguments regarding good faith both parties rely on *McMahon Food Corp. v. Burger Dairy Co.,* 103 F.3d 1307 (7th Cir.1996). In Illinois, as in Minnesota, a party must prove that he or she acted in good faith in tendering an instrument in full satisfaction of a claim. *See* 810 Ill. Comp. Stat. Ann. 5/3–311 (West 1992). In *McMahon Food Corp.,* McMahon and Burger Dairy had an ongoing business relationship. *See* 103 F.3d at 1310. The debtor (McMahon), in tendering the instrument for the offer of the accord, purposely misled the creditor about the amount in dispute. *See id.* at 1310–12. In attempting to resolve a dispute regarding multiple transactions, McMahon purposely led Burger Dairy to believe that previous disputes had already been resolved, when in fact they had not. *See id.* at 1311. As a result, the accord and satisfaction that was offered misrepresented the actual amount in dispute. The bad faith was directly related to the tender of the accord, and not purely related to McMahon's actions with respect to the underlying contracts, and the district court found accord and satisfaction to be unenforceable. *See id.* at 1313, 1317.

The court in *McMahon* affirmed the district court's finding that McMahon had acted in bad faith and taken advantage of Burger Dairy by misinforming it about the total amount in dispute " 'at the time payment was tendered.' " *Id.* at 1313 (citation omitted). McMahon therefore failed to meet section 3–311(a)'s good faith requirement. *See id.* In contrast, the district court here relied exclusively on AE&E's misrepresentations and concealment of facts related to the underlying sales contract. The district court made no findings relating specifically to AE&E's tender of the instrument offering the ac-

---

insurance policy. The claimant is necessitous and the amount of the check is very small in relationship to the extent of the injury and the amount recoverable under the policy. If the trier of fact determines that the insurer was taking unfair advantage of the claimant, an accord and satisfaction would not result from payment of the check because of the absence of good faith by the insurer in making the tender. Another example of lack of good faith is found in the practice of some business debtors in routinely printing full satisfaction language on their check stocks so that all or a large part of the debts of the debtor are paid by checks bearing the full satisfaction language, whether or not there is any dispute with the creditor. Under such a practice the claimant cannot be sure whether a tender in full satisfaction is or is not being made. Use of a check on which full satisfaction language was affixed routinely pursuant to such a business practice may prevent an accord and satisfaction on the ground that the check was not tendered in good faith under subsection (a)(i).
U.C.C. § 3–311 cmt. 4, *reprinted in* Minn.Stat. Ann. § 336.3–311.

cord. Moreover, neither Webb nor the district court established a connection between AE&E's conduct as it related to the underlying sales contract and its offer of the accord. We conclude, therefore, that the district court erred as a matter of law in finding AE&E's tender of its check to Webb under Minn.Stat. § 336.3–311 was in bad faith. *See generally Shema v. Thorpe Bros.*, 240 Minn. 459, 62 N.W.2d 86 (1953). It may be possible that fraud or misrepresentation relating to an underlying contract is so pervasive that the fraud infects the good faith offer of an accord. However, where the district court fails to draw any connection between fraud in the underlying contract and the tender of the accord, such as in this case, those circumstances are not present. Because the district court's finding of bad faith was controlled by an error of law, we set the finding aside. *See In re Holden's Trust*, 207 Minn. at 227, 291 N.W. at 112.

The court of appeals reasoned that because AE&E offered the accord with the knowledge that there were outstanding obligations in dispute, good faith was lacking. Section 336.3–311(a)(ii) *requires* that there be a bona fide dispute as to the amount of the claim or that the claim was unliquidated for an accord and satisfaction to be valid. The purpose of entering into an accord and satisfaction is to settle these disputed claims. Therefore, the existence of a dispute regarding the amount of the underlying claim cannot constitute bad faith for purposes of an accord and satisfaction.

We reverse the decision of the court of appeals and hold that the district court erred as a matter of law in finding that AE&E's offer of the accord to Webb was in bad faith based on the conduct relating to the underlying sales contract. Because the district court did not focus on the formation of the accord and satisfaction in determining good faith, we remand to the district court for that determination.

## II.

We turn now to the second issue: Did the court of appeals err in holding that because mutual agreement is not explicitly enumerated in Minn.Stat. § 336.3–311, such agreement is not necessary to create an enforceable accord and satisfaction?

Under common law, accord and satisfaction may not be found where mutual agreement is lacking. *See Butch Levy Plumbing and Heating, Inc.*, 267 Minn. at 290–91, 126 N.W.2d at 385–86; 6 Corbin, *supra*, § 1277. For an accord and satisfaction to be enforceable, the payment must be offered in full satisfaction of the debt, and the payment must be accepted as the same. *See Butch Levy Plumbing and Heating, Inc.*, 267 Minn. at 290–91, 126 N.W.2d at 385–86; *Youngstown Mines Corp.*, 266 Minn. at 463–64, 124 N.W.2d at 338–39.

As noted above, Minn.Stat. § 336.3–311 was intended to codify the common law elements of accord and satisfaction. *See* U.C.C. § 3–311 cmt. 3, *reprinted in* Minn. Stat. Ann. § 336.3–311; *supra* note 4. The common law elements include the basic contractual requirement of mutual agreement and therefore the court of appeals erred in holding that mutual agreement was not necessary for an accord and satisfaction under Minn.Stat. § 336.3–311.

AE&E argues that even if we conclude that mutual agreement is a separate element of an accord and satisfaction under the U.C.C., it is demonstrated here by the conduct of the parties. The district court made no specific factual findings with respect to the formation of the accord and satisfaction. The court simply concluded that the parties did not agree that Webb was accepting payment in full satisfaction.

The agreement necessary to form a contract need not be express, but may be implied from circumstances that clearly and unequivocally indicate the intention of the parties to enter into a contract. *See Shema*, 240 Minn. at 465, 62 N.W.2d at 90.

Minnesota Statutes § 336.3–311(a) and (b) require a conspicuous statement that the tender of payment is offered as full satisfaction of the claim. By obtaining payment under that conspicuous statement, the creditor has communicated his agreement to the transaction. Performance of the statutory requirements therefore demonstrates a mutual agreement to effectuate a contract in which the creditor accepts payment from the debtor that serves to discharge claims against the debtor.

We hold that once the elements of section 336.3–311(a) and (b) are met, mutual agreement of the parties to enter into an accord and satisfaction is presumed as a matter of law. The presumption may be rebutted where the party challenging the accord and satisfaction can demonstrate, for example, some ambiguity in the language of the instrument or the accompanying communication such that a reasonable person would not have understood that payment was meant to discharge the obligation. *See, e.g., Imperial Elevator Co. v. Hartford Accident & Indem. Co.*, 163 Minn. 481, 487–88, 204 N.W. 531, 533–34 (1925).

Because the district court did not make findings regarding the formation of the accord and satisfaction, or determine whether ambiguity exists with respect to the offer of an accord that would defeat a finding of mutual agreement on the accord and satisfaction, we remand this case to the district court for findings as to whether any ambiguity existed sufficient to rebut the presumption of mutual agreement.

We hold that the district court erred in imputing bad faith to an accord and satisfaction from conduct relating only to the underlying contract. We also hold that mutual agreement is required for an enforceable accord and satisfaction.

Reversed and remanded.