**BORDER STATE BANK OF GREEN-BUSH, Appellant (A03–1973), Plaintiff (A04–86),**

v.

**BAGLEY LIVESTOCK EXCHANGE, INC., Respondent (A03–1973), Defendant (A04–86),**

**Bert Johnson, d/b/a/ Johnson Farms, Respondent (A03–1973), Defendant (A04–86),**

**and**

**Bert Johnson, d/b/a/ Johnson Farms, third-party plaintiff, Respondent (A03–1973), Appellant (A04–86),**

v.

**Hal Anderson, third-party defendant, Respondent.**

Nos. A03–1973, A04–86.

Court of Appeals of Minnesota.

Dec. 14, 2004.

Review Denied Feb. 23, 2005.

Michael L. Jorgenson, Thief River Falls, MN, for appellant Border State Bank of Greenbush.

Patrick W. Fisher, Troy J. Lefevre, Grand Forks, ND, for respondent Bagley Livestock Exchange, Inc.

William M. Hart, Erica Gutmann Strohl, Meagher & Geer, P.L.L.P., Minneapolis, MN, and Robert M. Albrecht, Brink, Sobolik, Severson, Malm & Albrecht, P.A., Hallock, MN, for respondent Bert Johnson, d/b/a Johnson Farms.

Alan B. Fish, Alan B. Fish, P.A., Roseau, MN, for respondent Hal Anderson.

Considered and decided by TOUSSAINT, Chief Judge; LANSING, Judge; and CRIPPEN, Judge.*

## OPINION

LANSING, Judge.

This action arises from a dispute over the enforceability of a security interest and the interpretation of the cattle-sharing agreement that underlies the security interest. The district court, apparently relying on an incorrect argument that an ownership interest was necessary for the security interest to attach, made no findings on the disputed provisions of the agreement. We therefore reverse the district court's order directing a verdict against the bank, which attempted to enforce the security interest in a conversion claim, and remand for the court to address the disputed provisions. We affirm, however, the jury verdict adjudicating the claims between the cattlemen on the breach of the underlying cattle-sharing agreement. The record contains competent evidence to sustain the verdict, the special-verdict form conveyed a correct understanding of the law, and the damages assessed by the jury do not require remittitur.

## FACTS

Bert Johnson, doing business as Johnson Farms, and Hal Anderson entered into an oral cattle-sharing contract in December 1997. Approximately one month later, they memorialized the oral contract in written form. Under the written instrument, Anderson agreed to care for and breed cattle owned by Johnson and Johnson would receive a "guaranteed" percentage of the annual calf crop. The contract further provided that the cattle Johnson placed with Anderson were "considered to be owned by Johnson Farms and any offspring is to be sold under Johnson Farms' name." The contract required Johnson Farms and Anderson mutually to agree when the calves would be sold and within thirty days of receiving money for the sale, Johnson Farms to pay the "remainder" to Anderson "for his keeping of [the] cattle."

In the fall of 1998 and 1999, calves bred under the contract were sold under the provisions of the written contract. Anderson testified that in October 1999, Johnson asked him to care for additional cattle on the same terms. Anderson initially declined, explaining to Johnson that he was ending his cattle business because of adverse personal circumstances. Anderson said that his father had died, his mother was in a nursing home, his partner,

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. Art. VI, § 10.

Linda Peterson, was caring for an ill family member, he had no additional help at his farm, he had insufficient feed for the cattle, and he had not planted hay for the coming winter. Nevertheless, according to Anderson, they continued to discuss their cattle-sharing contract, and he eventually agreed to continue based on certain modifications: (1) the share percentage would be a straight 40/60 split, without Johnson's "guaranteed" percentage; (2) Johnson would provide feed, including beet tailings; (3) Johnson would provide additional pasture; and (4) the agreement would include approximately 500 cattle, instead of the original 151 cattle.

Johnson testified that he discussed the cattle-sharing agreement with Anderson in October 1999 and that he agreed to send Anderson beet tailings, which were free to him, so long as Anderson paid the cost of shipping. Johnson also testified that he and Anderson agreed that approximately 500 cattle would be cared for under the cattle-sharing agreement, rather than the original 151 cattle. But Johnson denied that he had agreed to provide feed, other than the beet tailings, and denied that he had agreed to change the provision that "guaranteed" that his percentage of the calf crop would be calculated on the initial number of cows regardless of whether each produced a calf that survived.

In March 2000, Anderson negotiated with Border State Bank for loans totaling $155,528. To secure these loans, Anderson granted Border State Bank a security interest in, among other things, all of Anderson's "rights, title and interest" in all "livestock" then owned or thereafter acquired.

After the modification of the cattle-sharing contract, Johnson made a number of shipments of beet tailings to Anderson. When Johnson stopped the shipments, he sent checks totaling $55,000 to Anderson for the purchase of feed. In November 2000, Anderson encountered difficulty caring for the cattle due to heavy rainfall and lack of feed. The cattle were reclaimed by Johnson, but the calves remained with Anderson for sale. At trial, Anderson testified that some of the cattle that Johnson reclaimed were actually Anderson's cattle or were cattle that belonged to Evonne Stephens, another person with whom Anderson had a cattle-sharing contract.

In December 2000, 289 calves that had remained with Anderson were sold at Bagley Livestock Exchange. The livestock exchange knew of Border State's security interest in Anderson's livestock but, after discussing the agreement with Johnson, determined the security interest did not attach to the calves. The livestock exchange issued a check to Johnson Farms in the amount of $119,403. Thereafter, Johnson gave Anderson a check for $19,404, representing Anderson's share of the sale proceeds, less $55,000 that Johnson claimed as repayment for money advanced to Anderson to purchase feed.

Border State Bank sued Bagley Livestock Exchange and Johnson, contending that they had converted Border State Bank's perfected security interest in the calves sold in December 2000. In a third-party complaint, Johnson sought indemnity from Anderson, in the event that Border State Bank was successful on its conversion claim. Anderson served a counterclaim against Johnson, asserting breach of contract.

These claims were tried to a jury in September 2003. Following Border State Bank's case-in-chief, Johnson and Bagley Livestock Exchange moved for a directed verdict. The district court granted the motion, finding that, under the cattle-sharing agreement, Johnson did not "grant" Anderson an "ownership interest" in the calves. Border State Bank appeals from

the directed verdict on its conversion claim.

Following the directed verdict, Anderson presented evidence on his breach-of-contract counterclaim against Johnson, and the counterclaim was submitted to the jury. In response to special-verdict questions, the jury determined that the written contract between Anderson and Johnson had been modified, Johnson breached the contract, and Johnson's breach directly caused damages to Anderson in the amount of $92,360. Johnson moved for judgment notwithstanding the verdict (JNOV), or, in the alternative, a new trial or remittitur. The district court denied Johnson's posttrial motions. Johnson appeals from that denial.

## ISSUES

I. Did the district court err by issuing a directed verdict against Border State Bank?

II. Does the record contain competent evidence to sustain the verdict?

III. Did the district court abuse its discretion by denying Johnson's motion for new trial?

IV. Did the district court abuse its discretion by submitting to the jury a special-verdict form that conveyed an incorrect understanding of the law?

V. Were the damages assessed by the jury so unjustified that the district court abused its discretion in denying the posttrial motion for remittitur?

## ANALYSIS

### I

■ Border State Bank argues that the district court erred in issuing a directed verdict on its conversion claim. A district court may grant a motion for a directed verdict when, as a matter of law, the evidence is insufficient to present a question of fact to the jury. *Zinnel v. Berghuis Constr. Co.*, 274 N.W.2d 495, 498 (Minn. 1979). On review, an appellate court "must independently determine whether an issue of fact exists when the evidence is viewed in a light most favorable to the nonmoving party." *Baber v. Dill*, 531 N.W.2d 493, 495 (Minn.1995). In analyzing the propriety of a directed verdict, we review the evidence in a light most favorable to the nonmoving party. *Id.*

■ Article 9 of the Uniform Commercial Code, incorporated into Minnesota law, provides that a security interest attaches to collateral, and is enforceable against the debtor or third parties, when (1) value has been given; (2) the debtor "has rights in the collateral or the power to transfer rights"; and (3) the debtor has signed a security agreement that contains a description of the collateral. Minn.Stat. § 336.9–203(b) (2002). To perfect the security interest, both the security agreement and financing statement must contain an adequate description of the collateral. *Prod. Credit Ass'n of W. Cent. Minn. v. Bartos*, 430 N.W.2d 238, 240 (Minn.App.1988). We liberally construe descriptions in the security agreement and financing statement because their essential purpose is to provide notice, not to definitively describe each item of collateral. *World Wide Tracers, Inc., v. Metro. Prot. Inc.*, 384 N.W.2d 442, 447 (Minn.1986).

■ The parties do not dispute that Anderson signed a security agreement and that value was given. The security agreement stated that the collateral included, in part, "all livestock owned or hereafter acquired" and Anderson's "rights, title and interest" in such livestock. The financing statements covered "all livestock," whether

"now owned or hereafter acquired, together with the proceeds from the sale thereof." The parties also do not dispute the validity of these descriptions or the assertion that "livestock" includes cattle and calves. What is disputed is whether the bank's security interest attached to the 289 calves sold in December 2000 under Anderson and Johnson's cattle-sharing agreement. *See Wangen v. Swanson Meats, Inc.*, 541 N.W.2d 1, 3 (Minn.App. 1995) (stating that if security interest attaches to collateral transferred to third party, secured party may repossess collateral or maintain action for conversion), *review denied* (Minn. Jan. 25, 1996).

In directing a verdict against Border State Bank's conversion claim, the district court did not issue a written order. The district court, instead, briefly stated the decision on the record at the conclusion of Border State Bank's case-in-chief, following arguments by counsel. Johnson's attorney couched his argument in terms of "who actually owned these cattle." The attorney for the cattle exchange cast his argument in terms of a "mutual mistake of fact as to the ownership" and also referred to an "ownership interest." Anderson's attorney, in response, argued that "[m]erely titling something in somebody's name" does not determine "ownership interest." And the bank's attorney asserted that the provisions in the contract did not "indicate who owns [the] calves." The district court stated on the record that the cattle-sharing contract had not "granted" Anderson an "ownership interest" in the calves, specifically finding that "the modifications testified to by Mr. Anderson in the light most favorable to Border State Bank do not modify the terms of the agreement such that an ownership interest is granted." Based on the arguments presented, the district court apparently determined that, for Border State Bank's security interest to attach, Johnson would have had to grant Anderson an interest equivalent to ownership.

■ The provisions of the Uniform Commercial Code's Article 9, incorporated into Minnesota law, refer to "rights in the collateral," not solely the "ownership" of the collateral. Minn.Stat. § 336.9–203(b)(2) (stating security interest may attach to collateral if "the debtor has rights in the collateral or the power to transfer rights in the collateral"). Rights in the collateral, as the term is used in Article 9, include full ownership and limited rights that fall short of full ownership. Minn. Stat. Ann. § 336.9–203 U.C.C. cmt., para. 6 (West 2002) ("A debtor's limited rights in collateral, short of full ownership, are sufficient for a security interest to attach."); *see also Greenbush State Bank v. Stephens*, 463 N.W.2d 303, 306 (Minn.App. 1990) (explaining that "ownership" under the UCC can be shared, with each party possessing its own bundle of interests"), *review denied* (Minn. Feb. 4, 1991). Simply stated, the UCC "does not require that collateral be owned by the debtor." *State Bank of Young Am. v. Vidmar Iron Works, Inc.*, 292 N.W.2d 244, 249 (Minn. 1980).

Other jurisdictions have cautioned against an interpretation that ownership rights are necessary for the attachment of a security interest. For purposes of the UCC, "sufficient rights" arise with far less than full ownership. *Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank of Tulsa*, 705 F.2d 396, 398–99 (10th Cir.1983). Ownership or title is not the relevant concern under Article 9; "the issue is whether the debtor has acquired sufficient rights in the collateral so that the security interest would attach." *Fricke v. Valley Prod. Credit, Ass'n*, 721 S.W.2d 747, 753 (Mo.Ct. App.1986). The "rights in the collateral" language is a "gateway through which one

looks to other law to determine the extent of the debtor's rights." *Am. Bank & Trust v. Shaull,* 678 N.W.2d 779, 788 (S.D. 2004). Thus, "[a]ll or some of owner's rights can be transferred by way of sale, lease, or license [and a] person with transferable rights can grant an enforceable security interest in those rights." *Id.* at 788, n. 4. A "security interest will attach to the collateral only to the extent of the debtor's rights in the collateral"; mere possession of the collateral is insufficient to support an attachment, but the debtor need not have full ownership. *Pleasant View Farms, Inc. v. Ness,* 455 N.W.2d 602, 604 (S.D.1990). "The common conceptualization of property rights as consisting of a bundle of sticks is helpful in understanding when a debtor has sufficient rights in an asset to grant an enforceable Article 9 security interest." *First Nat'l Bank of Philip, S.D. v. Temple,* 642 N.W.2d 197, 204 (S.D.2002) (quotation omitted).

■ The district court did not analyze the modified cattle-sharing contract to determine the nature of Anderson's rights in the calves or whether Anderson's interests or rights were sufficient to permit attachment of a security interest. We conclude that the standard relied on by the district court is inconsistent with Minnesota law. The application of the incorrect standard prematurely terminated the analysis of the cattle-sharing agreement, which is necessary to determine whether Anderson's rights in the collateral were sufficient for the bank's security interest to attach. Findings of fact that are controlled or influenced by errors of law are not final and must be set aside. *Webb Bus. Promotions, Inc. v. Am. Elecs. & Entm't Corp.,* 617 N.W.2d 67, 73 (Minn.2000). Because the district court applied a standard of ownership that is inconsistent with Minnesota law, its finding that the security

interest did not attach was influenced by an error of law.

■ In applying the correct legal standard, the district court must initially determine whether the cattle-sharing agreement is ambiguous. *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn. 1979). The agreement suggests ambiguity by stating that the cattle provided by Johnson continue to be "owned" by Johnson, but, with respect to the calves, requiring only that they are to be sold in Johnson's "name." When contract language is susceptible to more than one meaning, the interpretation of the contract becomes a question of fact. *Trondson v. Janikula,* 458 N.W.2d 679, 681 (Minn.1990). The parties whose interests are affected by this determination should have a full opportunity to argue whether the cattle-sharing contract is ambiguous.

For these reasons, we reverse the district court's order that directed the verdict on Border State Bank's conversion claim. On remand, the district court shall consider the cattle-sharing agreement to determine whether Anderson had "rights" in the calves, to which the bank's security interest attached.

**II**

■ Johnson argues that the district court erred in denying his posttrial motion for JNOV, contending that "Andersons oral-modification claim is supported by evidence that is so intrinsically incredible and improbable that the jurys verdict cannot stand."

We review de novo the district court's denial of a motion for judgment notwithstanding the verdict. *Pouliot v. Fitzsimmons,* 582 N.W.2d 221, 224 (Minn.1998). On appeal, we do not weigh the evidence or assess the credibility of the witnesses. *Conroy v. Book Automation, Inc.,* 398 N.W.2d 657, 662 (Minn.App.1987). We will

affirm the denial if there is "any competent evidence reasonably tending to sustain the verdict." *Id.* But if "the jury's verdict cannot be sustained on any reasonable theory of the evidence," the moving party is entitled to judgment notwithstanding the verdict as a matter of law. *Obst v. Microtron, Inc.*, 614 N.W.2d 196, 205 (Minn.2000).

Anderson testified to oral modifications of the cattle-sharing agreement. He explained that in the fall of 1999 he had decided to get out of the cattle business. Because of this decision, he did not plant hay for the upcoming winter and told Johnson that he was not going to care for any more cattle. According to Anderson, in response to his reluctance to continue, Johnson agreed to modify the cattle-sharing contract to provide that (1) the share percentage would be a straight 40/60 split; (2) Johnson would provide feed, including beet tailings; (3) Johnson would provide additional pasture; and (4) the contract would cover approximately 500 cattle. Because of these modifications, Anderson agreed to continue to perform under the agreement.

Johnson testified that he agreed to send Anderson beet tailings, which were free to him, so long as Anderson paid the price of shipping. Johnson also testified that he agreed that approximately 500 cattle would be cared for under the contract and that he would provide some pasture. But Johnson denied that he agreed to provide feed, other than the beet tailings, and denied that he agreed to change the calf-crop percentage.

Johnson made multiple shipments of beet tailings to Anderson. After ending these shipments, Johnson sent checks totaling $55,000 to Anderson for the purchase of feed. Anderson testified that these checks were provided as part of the modified contract whereby Johnson agreed to feed the cattle. Johnson testified that these checks were provided as advances to Anderson, which Anderson was required to repay because under the contract Anderson was responsible for feeding the cattle.

On this record, we conclude that the testimony of Anderson and Johnson would provide support for a jury to decide the dispute either way, depending on whose testimony they found to be more credible. The jury apparently disbelieved Johnson's testimony that the contract had not been modified and believed Anderson's testimony that it had. *See Merickel v. Erickson Stores Corp.*, 255 Minn. 12, 16, 95 N.W.2d 303, 306 (1959) (stating modification to written contract may be evidenced by oral agreement); *see also Hentges v. Schuttler*, 247 Minn. 380, 384, 77 N.W.2d 743, 746 (1956) (stating the testimony of a single witness may legally suffice as evidence upon which to sustain a verdict). Additionally, Anderson's testimony was corroborated by evidence that Johnson performed under the modified contract by sending beet tailings and money to purchase feed. *See Merickel*, 255 Minn. at 16, 95 N.W.2d at 306 (observing that modification to written contract may be evidenced by conduct). Because the record contains competent evidence to sustain the verdict, the district court properly denied Johnson's motion for JNOV.

### III

█ Johnson argues, in the alternative, that the district court erred in denying his motion for new trial because the evidence does not justify the verdict.

█ The granting of a new trial rests in the discretion of the district court, and the district court's decision will be reversed only for a clear abuse of that discretion. *Boschee v. Duevel*, 530 N.W.2d

834, 840 (Minn.App.1995), *review denied* (Minn. June 14, 1995). "A new trial should not be granted unless the verdict is so contrary to the preponderance of the evidence as to imply that the jury failed to consider all the evidence or acted under some mistake or from some improper motive, bias, feeling or caprice, instead of honestly and dispassionately exercising its judgment." *Lamb v. Jordan*, 333 N.W.2d 852, 855–56 (Minn.1983) (quotation omitted).

In *Lamb*, the Minnesota Supreme Court held that a new trial was required when the only evidence supporting the jury's verdict was respondent's testimony, which was "contradicted by logic and other evidence at almost every point." *Id.* at 856. Johnson argues that Anderson's testimony was similarly contradicted by logic and evidence because "the claimed modifications are intrinsically improbable," "the lone corroborating witness never materialized at trial," and "Anderson has a history of questionable business dealings." Johnson also argues that the tactics Anderson used at trial "suggested to the jury that they employ an improper motive or bias as a basis for their verdict." Specifically, Johnson points to the characterization of Anderson as a struggling, family farmer, in contrast to the characterization of Johnson as a shrewd, powerful businessman.

This argument overlooks Anderson's testimony that he intended to change jobs and no longer provide care for cattle because of his father's death, other medical problems in his family, lack of feed, and lack of assistance at his farm. At the time, Anderson was caring for approximately 500 cattle owned by Johnson.

Contrary to Johnson's contention, it is logical that Johnson would have an interest in Anderson continuing to care for his approximately 500 head of cattle located on Anderson's farm. It is also logical, given Anderson's life circumstances, that Johnson would consent to modifications of the agreement to induce Anderson to continue his performance. Additionally, evidence of Johnson's performance after the alleged modifications substantiates Anderson's testimony; Johnson began shipping beet tailings to Anderson and provided Anderson with money for the purchase of feed. On this record, we cannot say that the verdict was so contrary to the preponderance of the evidence that it compels a new trial. The district court did not abuse its discretion by denying Johnson's motion for new trial.

## IV

Johnson argues that he is entitled to a new trial because the special-verdict form conveyed an incorrect understanding of the law by asking only one question on oral modification of the cattle-sharing contract, instead of directing the jury to consider each of the claimed modifications separately.

The specific wording of the special-verdict form is left to the discretion of the district court. *Dang v. St. Paul Ramsey Med. Ctr., Inc.*, 490 N.W.2d 653, 658 (Minn.App.1992), *review denied* (Minn. Dec. 15, 1992). "[A]ll that is required is that the charge as a whole convey to the jury a clear and correct understanding of the law." *Benson v. Northwest Airlines, Inc.*, 561 N.W.2d 530, 539 (Minn.App.1997), *review denied* (Minn. June 11, 1997).

The special-verdict form asked four questions: "Was the January 23, 1998 contract modified?"; "Did Bert Johnson breach the contract with Hal Anderson?"; "Did Bert Johnson's breach of the contract directly cause damage to Hal Anderson?"; and "What amount of money will fairly and adequately compensate Hal Anderson for

the damages directly caused by Bert Johnson's breach of the contract?"

Liability for breach of contract requires proof that damages resulted from or were caused by the breach. *Nguyen v. Control Data Corp.*, 401 N.W.2d 101, 105 (Minn.App.1987). The special-verdict form directed the jury to assess Anderson's damages only if the jury found that the contract was modified, Johnson breached the contract, and Johnson's breach directly caused damage to Anderson. The special-verdict form conveyed a clear and correct understanding of the law. The district court did not abuse its discretion, and Johnson is not entitled to a new trial.

## V

Johnson contends that the district court abused its discretion by denying his motion for remittitur, arguing that a portion of the awarded damages constituted error because Anderson did not own 25 of the cattle for which he claimed damages.

To alter a district courts decision on a motion for remittitur, we must conclude that the court clearly abused its discretion. *State by Humphrey v. Briggs*, 488 N.W.2d 811, 814 (Minn.App.1992), *review denied* (Minn. Sept. 15, 1992). A motion for remittitur requires that the district court consider all of the evidence and determine "whether the verdict is within the bounds of the highest sustainable award under the evidence." *McPherson v. Buege*, 360 N.W.2d 344, 347 (Minn.App. 1984). To warrant overturning a verdict on appeal, the damages must "so greatly exceed adequate compensation as to be accounted for on no other basis than that of passion or prejudice." *Id.* (quoting *Gilbertson v. Gross*, 232 Minn. 373, 375, 45 N.W.2d 547, 548 (1951)).

Anderson's complaint sought $104,059 in damages for Johnson's breach of the cat-

tle-sharing contract. On cross-examination, Anderson testified that he sought damages of "over [$]100,000" for breach of contract and for the value of "cows that are missing." Anderson also testified that some of the missing cows may have belonged to Evonne Stephens. Anderson's written accounting of damages under the contract alleged that he was owed $117,221 for his share of the December–2000 calf sales, plus feed.

Considering all the evidence, the damages assessed by the jury do not so greatly exceed adequate compensation that they could only be based on passion or prejudice. Furthermore, even if the jury did assess damages related to the 25 cattle purportedly owned by Stephens rather than Anderson, Anderson had standing to maintain the action for damages as bailee of Stephens's cattle. *See Grinnell–Collins Co. v. Ill. Cent. R.R.*, 109 Minn. 513, 516, 124 N.W. 377, 378 (1910) (reasoning that person in possession of property as bailee may maintain action for loss of that property if it is taken from him or damaged by wrongful act of another). The district court did not abuse its discretion by denying Johnson's motion for remittitur.

## DECISION

Minn.Stat. § 336.9–203(b) (2002) refers to "rights in the collateral." The district court applied the wrong legal standard by limiting its inquiry to whether Anderson owned the cattle and erred in failing to address whether the debtor held "rights" in the collateral under the cattle-sharing agreement. We reverse the directed verdict on the bank's conversion claim and remand for further proceedings. Because the record contains competent evidence to sustain the verdict, the special-verdict form conveyed a correct understanding of the law, and the damages assessed by the jury did not so greatly exceed adequate

compensation as to require remittitur, we affirm the district court's denial of Johnson's posttrial motions.

**Affirmed in part, reversed in part, and remanded.**